UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| ROBERT G. LOPEZ, | ) | NO. 11 CV 3185 (PAE) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | **REDACTED -** |
| v. | ) | TO COMPLY WITH |
|  | ) | PROTECTIVE ORDER |
| THE GAP INC., GAP INTERNATIONAL | ) |  |
| SOURCING, INC., OLD NAVY, LLC and | ) |  |
| OLD NAVY APPAREL, LLC, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

_____


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Robert W. Lehrburger (*rwlehrburger@pbwt.com*)
Nivritha C. Ketty (*nketty@pbwt.com*)
Solmaz F. Firoz (*sfiroz@pbwt.com*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel. (212) 336-2000

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................2

    A.  Lopez's Use of the Marks..............................................................................2

    B.  Defendants' Use of Lopez's Marks ................................................................5

    C.  Other Unauthorized Users of Lopez's Marks ................................................6

ARGUMENT ...............................................................................................................7

I.  Lopez's Trademarks are Protectable ......................................................................7

    A.  Lopez's LES Mark is Inherently Distinctive ...................................................7

    B.  Lopez's Other Marks Have Acquired Secondary Meaning.................................8

II.  Lopez's Use of the Marks is Sufficient for Protection ...........................................17

III.  There is a Genuine Issue of Material Fact as to Likelihood of Confusion ............................19

IV.  There is a Genuine Issue of Material Fact as to Whether Defendants' Use of the Marks

    Constitutes "Fair Use"..................................................................................29

CONCLUSION............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Express Co. v. Am. Express Limousine Serv.*,
    772 F. Supp. 729 (E.D.N.Y. 1991) ...............................................................................22

*Am. Olean Tile Co., Inc. v. Am. Marazzi Tile, Inc.*,
    No. 86-3089, 1988 WL 29056 (E.D. Pa. 1988) .......................................................29

*Artisan Mfg. Corp. v. All Granite & Marble Corp.*,
    559 F. Supp. 2d 442 (S.D.N.Y. 2008).............................................................7, 21

*Cartier, Inc. v. Sardell Jewelry, Inc.*,
    294 Fed. Appx. 615 (2d Cir. 2008).....................................................................24

*Centaur Commc'ns, Ltd. v. A/S/M/ Commc'ns, Inc.*,
    830 F.2d 1217 (2d Cir. 1987), *overruled on other grounds by Bristol-Myers Squibb Co. v. McNeil-P.PC., Inc.*, 973 F.2d 1033 (2d Cir. 1992) ............................... passim

*CJ Prods. LLC v Snuggly Plushez LLC*,
    809 F. Supp. 2d 127 (E.D.N.Y. 2011) .................................................................28

*Clinique Labs., Inc. v. Dep Corp.*,
    945 F. Supp. 547 (S.D.N.Y. 1996) ...............................................................20, 23

*CNB Fin. Corp. v. CNB Comm. Bank (IO)*,
    No. Civ. A. 03-6945 (PBT), 2004 WL 2434878 (E.D. Pa. Sept. 30, 2004) .............................9

*Coach Leatherware Co. Inc. v. Ann Taylor, Inc.*,
    933 F.2d 162 (2d Cir. 1991).......................................................................26

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979).......................................................................22

*Deer Park Spring Water, Inc. v. Appalachian Mountain Spring Water Co.*,
    762 F. Supp. 62 (S.D.N.Y. 1991) .................................................................29

*Eventide Inc. v. DOD Elec. Corp.*,
    No. 93 CIV 2713, 1995 WL 239044 (S.D.N.Y. Apr. 24, 1995)............................................11

*Gameologist Grp., L.L.C. v. Scientific Games Int'l, Inc.*,
    No. 09 Civ. 6261 (JGK), 2011 WL 5075224 (S.D.N.Y. Oct. 25, 2011) ................................19

*GMA Accessories, Inc. v. Croscill, Inc.*,
    No. 06 Civ. 6236, 2008 WL 591803 (S.D.N.Y. Mar. 13, 2008) .......................................21, 25

*Gordon v. Virtumundo, Inc.,*
    575 F.3d 1040 (9th Cir. 2009) ..................................................................................14

*Gruner + Jahr USA Publ'g v. Meredith Corp.,*
    991 F.2d 1072 (2d Cir. 1993)......................................................................................7

*GTFM, Inc. v. Solid Clothing, Inc.,*
    215 F. Supp. 2d 273 (S.D.N.Y. 2002)........................................................................16

*Gucci Am., Inc. v. Action Activewear*,
    759 F. Supp. 1060 (S.D.N.Y. 1991)...........................................................................23

*Gucci Am., Inc. v. Gucci,*
    No. 07 Civ 6820, 2009 WL 8531026 (S.D.N.Y. Aug. 5, 2009) ..............................21

*GUESS? Inc. v. Mai-Tai Boutique*,
    No. 85 Civ. 9254 (JES), 1988 WL 31878 (S.D.N.Y. March 30, 1988)....................23

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
    858 F.2d 70 (2d Cir. 1988)........................................................................................25

*Heisman Trophy Trust v. Smack Apparel*,
    637 F. Supp. 2d 146 (S.D.N.Y. 2009)........................................................................19

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011)......................................................................................14

*In re Playland Holding Corp.*,
    1 N.Y.2d 300 (1956) ...................................................................................................9

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 365
    (S.D.N.Y. 2007) .......................................................................................................19

*JA Apparel Corp. v. Abboud*,
    682 F. Supp. 2d 294 (S.D.N.Y. 2010)........................................................................29

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.,*
    478 F. Supp. 2d 340 (E.D.N.Y. 2007) ................................................................13, 17

*Katz v. Adecco USA, Inc.*,
    No. 11 Civ. 2540, 2011 WL 2436670 (S.D.N.Y. June 16, 2011)..........................26

*Kookai, S.A. v. Shabo*,
    950 F. Supp. 605 (S.D.N.Y. 1997) ...........................................................................24

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*,
    495 F.2d 1265 (2d Cir. 1974).....................................................................................18

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
631 F. Supp. 735 (S.D.N.Y. 1985), *aff'd,* 799 F.2d 867 (2d Cir. 1986) ..........................20, 23

*Luv N' Care, Ltd. v. Walgreen Co.*,
695 F. Supp. 2d 125 (S.D.N.Y. 2010)....................................................................................7

*Malletier v. Burlington Coat Factory Warehouse Corp.*,
217 Fed. Appx. 1 (2d Cir. 2005).........................................................................................19

*Maternally Yours v. Your Maternity Shop*,
234 F.2d 538 (2d Cir. 1956)................................................................................................11

*Miss Universe, Inc. v. Patricelli*,
408 F.2d 506 (2d. Cir. 1969)................................................................................................9

*Momentum Luggage & Leisure Bags v. Jansport, Inc.*,
No. 00 Civ. 7909, 2001 WL 830667 (S.D.N.Y. July 23, 2001) .............................................18

*Morningside Grp. Ltd. v. Morningside Capital Grp. LLC*,
182 F.3d 133 (2d Cir. 1999)...........................................................................................20, 27

*Mortellito v. Nina of Cal., Inc.*,
335 F. Supp. 1288 (S.D.N.Y. 1972).................................................................................13, 15

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
704 F. Supp. 2d 305 (S.D.N.Y. 2010)........................................................................... passim

*Noma Lites, Inc. v. Lawn Spray, Inc.*,
222 F.2d 716 (2d Cir. 1955)................................................................................................11

*Patsy's Brand Inc. v. I.O.B. Realty, Inc.*
317 F.3d 209 (2d Cir. 2003)..............................................................................................7, 8

*Pfizer Inc. v. Sachs*,
652 F. Supp. 2d 512 (S.D.N.Y. 2009)...................................................................................25

*Phillips-Van Heusen Corp. v. Calvin Clothing Corp.*,
444 F. Supp. 2d 250 (S.D.N.Y. 2006)..................................................................................28

*Planned Parenthood Fed. of Am., Inc. v. Bucci*,
No. 97 Civ. 0629(KMV), 1997 WL 133313 (S.D.N.Y. March 24, 1997).............................14

*Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*,
486 F. Supp. 414 (S.D.N.Y. 1980) ......................................................................................13

*Polaroid Corp. v. Polarad Elecs., Corp.*,
287 F.2d 492 (2d Cir. 1961)....................................................................................... passim

*Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011) .........28

*Rodgers v. Wright*,
 544 F. Supp. 2d 302 (S.D.N.Y. 2008)................................................................22

*Saratoga Vichy Spring Co., Inc. v. Lehman*,
 625 F.2d 1037 (2d Cir. 1980).............................................................................10

*Scarves by Vera, Inc. v. Todo Imps. Ltd.*,
 544 F.2d 1167 (2d Cir. 1976).............................................................................12

*Shen Mfg. Co. v. Suncrest Mills, Inc.*,
 673 F. Supp. 1199 (S.D.N.Y. 1987).....................................................................16

*SLY Magazine, LLC v. Weider Publ'ns LLC*,
 529 F. Supp. 2d 425 (S.D.N.Y. 2007)..................................................................21

*Stars Indus., Inc. v. Bacardi & Co. Ltd.*,
 412 F.3d 373 (2d Cir. 2005).........................................................................7, 8, 25

*Stern's Miracle-Gro Prods., Inc. v. Sharks Prods. Inc.*,
 823 F. Supp. 1077 (S.D.N.Y. 1993).....................................................................16

*Sweetarts v. Sunline, Inc.*,
 380 F.2d 923 (8th Cir. 1967) ..............................................................................18

*T. Anthony, Ltd. v. Malletier*,
 No. 93 Civ. 6900 (KC), 1993 WL 659682 (S.D.N.Y. Nov. 24, 1993) .......................15, 20, 23

*TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*,
 244 F.3d 88 (2d Cir. 2001).................................................................................17

*THOIP v. Walt Disney Co.*, 736 F. Supp. 2d 689 (S.D.N.Y 2010) ...............................................28

*Thompson Med. Co. v. Pfizer, Inc.*,
 753 F.2d 208 (2d Cir. 1985).................................................................................10

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
 800 F. Supp. 2d 515 (S.D.N.Y. 2011)...................................................................27

*U.S. Shoe Corp. v. Brown Group, Inc.*,
 740 F. Supp. 196 (S.D.N.Y. 1990) .......................................................................29

*Virgin Enter. Ltd. v. Nawab*,
 335 F.3d 141 (2d Cir. 2003).................................................................................27

*W.E. Bassett Co. v. Revlon, Inc.*,
 435 F.2d 656 (2d Cir. 1970).................................................................................12

**STATUTES**

15 U.S.C. § 1115(b)(4) ...................................................................................................29

15 U.S.C. § 1127....................................................................................................17, 18

**OTHER AUTHORITIES**

J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:25 (4th ed.).......9, 18

## PRELIMINARY STATEMENT

Defendants ask the Court to summarily deny a small business owner's right to preserve a brand that he has spent fifteen years building.  Robert Lopez started his brand in 1997 by designing T-shirts with the marks "Lower East Side" and "LES NYC."  Without taking a salary from this business, he expended significant personal resources to market and sell products featuring his marks.  Lopez also retained several individuals to distribute flyers and stickers and wear products, all featuring his marks.  Some of these individuals included well known R&B artists and DJs, who wore these products in on-stage appearances and/or at publicized events.  Acting as a live advertisement himself, Lopez has worn clothing displaying one or more of his marks virtually every day from late 2006 to today.

Through these efforts, Lopez's business has grown.  In 2006, Lopez began selling his products through a website with national reach.  Today Lopez continues to sell products bearing the Lower East Side and LES NYC marks in addition to products bearing a stylized "LES" mark (collectively, "Marks"), which he began using on his products in late 2010.  He currently sells these products through a retail store, which is grossing over $7,000 a month in sales, and through his website.  The success of Lopez's business is, however, threatened by the encroachment of several mass retailers including Defendants.  In January 2011 Defendants began selling a Men's T-Shirt, which contained the phrases "Lower East Side" and "New York Sports Club" as well as an "LES" logo strikingly similar to Lopez's stylized LES mark.  Lopez later learned that Defendants had also sold a Women's T-Shirt featuring the phrase "Lower East Side" in 2009.  To protect his rights in his Marks, Lopez instituted the instant action.

Seizing upon the size of Lopez's business, which is indisputably smaller than Defendants' mass retail operations, Defendants now move for summary judgment arguing that

Lopez's Marks are not entitled to protection and that Defendants did not violate Lopez's trademark rights by selling products that featured his Marks. But because there are genuine issues of material fact relating to the protectability of Lopez's Marks, the likelihood of confusion resulting from the similarity of Lopez's and Defendants' products, and Defendants' alleged fair use of Lopez's marks, summary judgment should be denied.

## STATEMENT OF FACTS

### A.     Lopez's Use of the Marks

Lopez started his apparel business in 1997 when he used a heat press in his apartment to create T-shirts bearing the marks "Lower East Side" and "LES NYC." Lopez offered these shirts for sale at $15.00 each. Lopez initially offered his T-shirts to friends in the Lower East Side neighborhood of Manhattan. Declaration of Robert G. Lopez (hereinafter "Lopez Decl.") ¶ 13. Having grown up in the LaGuardia Houses, Lopez was well known in this community. *Id*. ¶ 2. His T-shirts soon gained popularity. *Id.* ¶ 14.

In response to the growing demand for his T-shirts, Lopez purchased a silk screen in 1999, which enabled him to increase production. *Id.* ¶ 14. He also began selling his T-shirts under the business brand name L.E.S. Clothing Co., which he still uses today. *Id*. ¶ 15. And he began packaging his T-shirts with see-through packaging and stickers that said "L.E.S. Clothing Co." and "Lower East Side" and/or "LES NYC." *Id*. ¶ 16. Lopez promoted his products primarily through grassroots street marketing by distributing flyers throughout the Lower East Side of New York. *Id*. ¶¶ 25-27. In addition, in late 2006, Lopez started wearing his products bearing either his Lower East Side or LES NYC Marks every day, including at public and private events. *Id*. ¶ 28.

In addition to continuing to sell T-shirts from his apartment and on the streets of Manhattan, in 2005, Lopez started selling his shirts in mom-and-pop stores in New Jersey. *Id.* ¶

18. Demand for Lopez's products grew and in that year, he created order forms, which he gave to friends to collect orders on his behalf.  He also placed these order forms in bodegas, record stores and arcades in the Lower East Side.  *Id*. ¶ 27.  These order forms displayed his business name LES Clothing Co. and his Lower East Side Mark.  *Id*.  In addition to the order forms, Lopez continued to print and distribute flyers bearing his marks in the Lower East Side.  *Id*.  By 2005, Lopez estimates that he was printing and distributing approximately 500 flyers a year.  *Id*. ¶ 26.  Lopez also solicited R&B artists and DJs to pose for photographs in clothing bearing his marks.  *Id*. ¶ 29, Exs.30-38.  Some of these artists also wore clothing bearing Lopez's marks in on-stage appearances and at other publicized events.  *Id*. ¶ 35, Exs. 23-26.

In 2006, Lopez expanded his product line.  In addition to T-shirts, he started to sell caps, hoodies, and vests, all of which bore at least one of his marks.  Lopez also expanded his marketing efforts.  *Id*. ¶ 17.  He paid colleagues to distribute flyers throughout the Lower East Side.  *Id*. ¶ 26.  Exploiting the Internet's wide reach, Lopez also created a Myspace page in 2006, where he displayed and offered for sale (through a PayPal link) products bearing his Lower East Side and LES NYC Marks.  *Id*. ¶ 19.  In addition, Lopez began selling his T-shirts in a barbershop on the Lower East Side.  *Id*. ¶ 18.

Recognizing the potential of his business, in 2007 Lopez redoubled his efforts. He outsourced production of his marketing materials and ordered thousands of flyers featuring his Marks to be printed.  *Id*. ¶ 30.  With the help of five acquaintances, Lopez distributed these flyers in the Lower East Side.  And to further secure rights in his growing brand, Lopez applied for and received a New York state trademark registration for his "Lower East Side" Mark in stylized letters with an underline and overline.  *Id*. ¶ 7, Ex. 2.  The following year, he applied for and received a state registration for a "mark comprised of the words LES NYC inside a circular

3

design made up of stars." *Id.* ¶ 9, Ex. 4.  Examples of Lopez's T-shirts featuring these Marks are shown on the next two pages.

By 2009, Lopez's business was generating several thousand dollars a year in sales. *Id.* ¶ 22; Declaration of Nivritha Ketty (hereinafter "Ketty Decl."), Ex. A at 76:5-7.  These sales consisted of in-person cash transactions, on-line orders from the Myspace page, and orders from a 1-800 number that Lopez purchased for his business.  Lopez Decl. ¶ 22.

In 2010, Lopez purchased the domain name "lesclothing.com" and linked this address to his Myspace page.  *Id.* ¶ 21.  And later that year, a designer created for (and assigned to) Lopez a logo with the three capital letters L, E, and S interconnected, whereby the lower portion of the "L" serves as the middle portion of the "E" and the lower portion of the "E" serves as the bottom portion of the "S" (hereinafter "LES Mark").  *Id.* ¶ 10, Ex. 5.  This mark is shown on the next page.  Lopez applied for and received a New York state trademark registration for his LES Mark on August 31, 2011.  *Id.*  ¶ 12.  Lopez first used the LES Mark on his products on December 15, 2010.  *Id.* ¶ 11.  Further accentuating his promotional efforts, Lopez even had the LES Mark tattooed onto the visible, lower part of his arm.  *Id.* ¶  28, Ex. 12 at LOP48.

In 2011, Lopez commissioned and paid for the design of a new website for LES Clothing Co.  *Id.* ¶ 21, Ex. 10 at LOP347.  Lopez also started a Facebook page for LES Clothing Co. and opened a Twitter account.  *Id.* ¶¶ 33-34.  The Marks are displayed throughout the website and Facebook page.  *Id.* ¶ 21, 33, Exs. 10, 22.  On February 1, 2012, Lopez opened the LES Clothing Co. retail store at 43 Clinton Street in Manhattan.  *Id.* ¶ 23.  In its first month, LES Clothing Co.'s retail store grossed more than $7,000.  *Id.* ¶ 24; Defendants' Declaration of James Weinberger Exhibit G (hereinafter "Weinberger Decl.").



LOP00000368



LOP00000041



D00000001

CONFIDENTIAL MATERIAL

***Drawing of Mark:*** *Certificate of Trademark Registration Number:   R31912*



Since 2007, Lopez has received media coverage—both solicited and unsolicited—of his products and brand in various media outlets. Lopez Decl. ¶¶ 35-39. Among others, LES Clothing Co.'s products, featuring the Marks, have appeared in a Pepsi/Yahoo video "Mic Pass - LES Kids" in 2007 (*Id.* ¶ 27, Ex. 27), Hip-Hop Weekly (*Id.* ¶ 36) and were worn by R&B artist Fokis in a photograph accompanying his feature article in the online hip hop publication "Hip Hop Game" (*Id.* ¶ 38, Ex. 28).

**B.    Defendants' Use of Lopez's Marks**

In April 2011, Lopez learned that The Gap, Inc., Gap International Sourcing, Inc., Old Navy, LLC and Old Navy (Apparel), LLC (collectively, "Defendants"), were selling a Men's T-shirt (hereinafter "Men's T-Shirt") printed with the words "Lower East Side" in cracked lettering in an arc above the intersecting capital letters L, E, and S, and the words "New York Sports Club" below the intersecting LES letters. *Id.* ¶ 47. This T-shirt is shown on the next page. Because of the striking similarities between the LES configuration on this shirt and Lopez's LES Mark, as well as the similarities between the "Lower East Side New York Sports Club" text and Lopez's Lower East Side and LES NYC Marks, Lopez brought this action. *Id.*

Defendants first offered their Men's T-Shirt for sale in January 2011 for $14.50. Ketty Decl. Ex. G (Def's Response to Interrogatories Nos. 8-9). Through discovery, Lopez also learned that Defendants had sold a women's T-shirt displaying the mark "Lower East Side NYC" (hereinafter "Women's T-Shirt"). The Women's T-shirt was first sold on December 28, 2009 for $14.50. *Id.* On December 12, 2011, Defendants stated that they could neither admit nor deny that they were still selling the Men's or Womens' T-shirts. Ketty Decl. Ex. 7 (Def's Response to Request for Admission No. 3). On January 19, 2012, however, Defendants stated that they were no longer selling them. Lopez Decl. ¶ 50, Ex. 45.

### C.    Other Unauthorized Users of Lopez's Marks

Lopez has been vigilant in protecting his Marks against unauthorized users.  As early as 2008, Lopez sent a cease and desist letter to New Era Cap Co. after learning that it was "manufacturing and selling fitted caps bearing the mark Lower East Side[TM]."  Lopez Decl. Ex. 39.  After receiving this letter, New Era agreed to stop using the Lower East Side Mark on its products.  *Id.* at LOP 260.  Likewise, in 2011, Lopez sent cease and desist letters to CafePress.com, Screened.com, Printfection LLC, and Print Mojo after learning that they were manufacturing and selling products bearing his Lower East Side and/or LES NYC Marks.  *Id.* ¶ 42, Exs. 40-43.  After receiving these letters, these companies stopped using these marks.  *Id.*

In that same year, four other large retailers—Payless Shoe Source, Aeropostale, Urban Outfitters, and J. Crew—also offered T-shirts bearing the Lower East Side Mark.  *Id.* ¶¶ 43-46. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████

**ARGUMENT**

Summary judgment should be denied because there are genuine issues of material fact relating to the protectability of Lopez's marks, the likelihood of confusion resulting from the similarity of Lopez's and Defendants' marks, and Defendants' alleged fair use of Lopez's Marks.

## I.   LOPEZ'S TRADEMARKS ARE PROTECTABLE

"To be entitled to protection a mark must be 'sufficiently distinctive' either because it is 'inherently distinctive' . . . or because it has acquired 'secondary meaning' in the minds of consumers." *Artisan Mfg. Corp. v. All Granite & Marble Corp.,* 559 F. Supp. 2d 442, 449 (S.D.N.Y. 2008).  Lopez has produced sufficient evidence to show that his Marks are sufficiently distinctive: the LES Mark being inherently distinctive, and the Lower East Side and LES NYC Marks having acquired secondary meaning.[1]

### A.   Lopez's LES Mark is Inherently Distinctive

A mark is inherently distinctive if "its intrinsic nature serves to identify its particular source." *Stars Indus., Inc. v. Bacardi & Co. Ltd.,* 412 F.3d 373, 381 (2d Cir. 2005).  A mark that is otherwise descriptive can be inherently distinctive if it is sufficiently stylized. *Patsy's Brand Inc. v. I.O.B. Realty, Inc.* 317 F.3d 209, 217 (2d Cir. 2003) (although a personal name alone is a descriptive mark that is generally weak, "a personal name rendered in a distinctive lettering style may be considered strong even without a showing of secondary meaning"); *see also Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1077-78 (2d

---

[1] In addition to his federal claim under 43(a) of the Lanham Act, Lopez also has asserted causes of action for trademark infringement and unfair competition under New York State law.  We agree with Defendants that Lopez's state trademark claim follows the same standard as his Lanham Act claim.  Lopez's state unfair competition claim, however, does not.  Under New York law, unfair competition requires a showing of likelihood of confusion and some showing of the defendant's bad faith, such as intentional palming off or misappropriation of business value; if bad faith is established, a showing of secondary meaning is not required.  *Luv N' Care, Ltd. v. Walgreen Co.,* 695 F. Supp. 2d 125, 135 (S.D.N.Y. 2010).  Thus, even if there were no issue of material fact as to the distinctiveness of Lopez's marks, Defendants' motion for summary judgment on the state unfair competition claim should be denied, or held in abeyance pending discovery on Defendants' bad/good faith.  *See infra* 26-27.

Cir. 1993) (otherwise descriptive mark PARENTS was strong in its stylized form).  For example in *Patsy's Brand,* the court found that although "Patsy's" standing alone was a descriptive mark, Plaintiff's rendition of this name was sufficiently stylized to be inherently distinctive.  Similarly in *Stars Industries,* the court found that the large elliptical "O" on plaintiff's orange-flavored vodka label  was "sufficiently stylized to be inherently distinctive."  412 F.3d at 383.  The court explained that marks consisting of stylized letters or shapes are inherently distinctive "provided the design is not common place but rather unique or unusual in the relevant market." *Id*. at 382.

Lopez's LES Mark is just such a mark.  It is a distinctive rendition of the letters L, E, and S.  Those letters are arranged in a unique configuration with a distinctive script such that the lower portion of the capital L forms the center line for the capital E and the lower portion of the capital E forms the lower portion of the capital S.  While the unique configuration of the letters L, E, and S, standing alone is distinctive, the mark is made even more distinct by the addition of the star which is an arbitrary design element.  *Patsy's,* 317 F.2d at 217-18 (finding that Patsy's Brand sauce mark was strong because it "is a distinctive rendition of a name in script letter accompanied by initials and a date as well as arbitrary design elements").  Accordingly the stylized LES Mark is entitled to protection without a showing of secondary meaning.  *Id.*

### B.    Lopez's Other Marks Have Acquired Secondary Meaning

Defendants correctly contend that a mark that consists merely of a geographic location is descriptive and thus not inherently distinctive.  Def.'s Br. at 12.  Lopez does not dispute that the phrase "Lower East Side" describes a geographic location.  Nor does he dispute that "LES" is an acronym for several phrases, including the "Lower East Side", or that "NYC" is an acronym for New York City.  Nonetheless, Lopez's Lower East Side and LES NYC Marks are protected by the Lanham Act because they have acquired secondary meaning.  *See, e.g., N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 315 (S.D.N.Y. 2010) ("Given

their strong secondary meaning, NYC TRIATHLON Marks are valid trademarks deserving of protection . . . ."); *Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 508 (2d. Cir. 1969) (finding that "Miss U.S.A." had acquired secondary meaning).

Secondary meaning "is a matter of fact, to be determined from relevant evidence probative of probable customer reaction." J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:25 (4th ed.). A descriptive mark acquires secondary meaning when the relevant "purchasing public associates goods designated by [the] mark with but a single - although anonymous - source." *Centaur Commc'ns, Ltd. v. A/S/M/ Commc'ns, Inc*., 830 F.2d 1217, 1227 (2d Cir. 1987), *overruled on other grounds by Bristol-Myers Squibb Co. v. McNeil-P.PC., Inc.,* 973 F.2d 1033, 1043 (2d Cir. 1992).

The secondary meaning inquiry is necessarily tied to the geographic location where the mark has been used and need not be national in scope. As the Court of Appeals has explained, "[c]ommon words may acquire 'secondary meaning' in a given locality, being understood therein to refer solely to a particular business or product." *In re Playland Holding Corp*., 1 N.Y.2d 300, 304 (1956). And when such meaning is acquired, "the words may not be used by any competing business in the same geographical area." *Id*.; *see also CNB Fin. Corp. v. CNB Comm. Bank (IO),* No. Civ. A. 03-6945 (PBT), 2004 WL 2434878, at *11 (E.D. Pa. Sept. 30, 2004) ("[W]here the owner's use of a mark in commerce is limited to a particular geographic area, the determination of whether the mark is entitled to trademark protection may turn on the mark's strength and acquired secondary meaning in the relevant geographic area, as opposed to the national market generally."). While Lopez has marketed and sold products featuring his Marks outside of New York, approximately 75% of his sales and the majority of his marketing has been in New York. Ketty Decl. Ex. A at 131:4-5. Thus, the relevant territory for

determining whether his Marks have acquired secondary meaning is New York, and the lower Manhattan area in particular.

The Second Circuit has set forth six factors to consider in determining whether a mark has acquired secondary meaning:  (1) length and exclusivity of use of the mark; (2) advertising expenditures; (3) sales success; (4) attempts to plagiarize the mark; (5) unsolicited media coverage; and (6) consumer studies linking the name to a source.  *Thompson Med. Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir. 1985).  No single factor is dispositive, and not every factor need be proved.  *Id.*

The relevant time period for establishing secondary meaning is the time of infringement.  *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir. 1980).  Because Defendants sold two shirts that infringed different Marks at different times, two separate inquiries for secondary meaning are required:  the first being whether Lopez's LES, Lower East Side and LES NYC Marks acquired secondary meaning by January 2011, which was when Defendants first sold their Men's T-shirt that featured the stylized LES with "Lower East Side" on top; and the second being whether Lopez's Lower East Side Mark had acquired secondary meaning by December 28, 2009, which was when Defendants first sold their Women's T-Shirt bearing the words "Lower East Side."

### 1.    There is a Material Issue of Fact as to Whether Lopez's Marks Acquired Secondary Meaning By January 2011

Lopez had been selling and promoting products featuring his Lower East Side and LES NYC Marks for 14 years before Defendants placed these Marks on their Men's T-Shirt.  His business has grown and received unsolicited publicity.  Lopez has shown that his Marks acquired secondary meaning by January 2011—or at least raised an issue of material fact as to its existence.

_Length and Exclusivity of Use_:  While length and exclusivity of use are often discussed together, they are two separate ideas.  Lopez has produced evidence weighing in favor of a finding of secondary meaning with respect to both.

There is no fixed period of time that a mark must be used to achieve secondary meaning.  _Centaur Commc'ns_, 830 F.2d at 1225.  Secondary meaning can be established after a period of years, a year, or even just a few months.  _Noma Lites, Inc. v. Lawn Spray, Inc.,_ 222 F.2d 716, 717 (2d Cir. 1955) ("It is possible that in the very seasonal business in which plaintiff is engaged the time period necessary for a product to acquire a secondary meaning may be quite short."); _Maternally Yours v. Your Maternity Shop_, 234 F.2d 538, 544 (2d Cir. 1956) (secondary meaning achieved for name of maternity apparel store after 11 months).  Lopez began using the Lower East Side and LES NYC Marks on T-shirts in 1997 and has used them continuously in commerce ever since.  This length of use weighs in favor of finding secondary meaning.

With respect to exclusivity, from 1997 to 2007 Lopez was not aware of any competing users of his Lower East Side or LES NYC Marks.  Ketty Decl. Ex. A at 170:2-6.  In _N.Y.C. Triathlon, LLC,_ 704 F. Supp. 2d at 315, this court found that the plaintiff's 10-year exclusive use of its mark "compel[led] a finding of secondary meaning."  Lopez's exclusive use compels the same finding here.

Lopez's vigilance in protecting his exclusive use of his further weighs in favor of finding of secondary meaning.  _See N.Y.C. Triathlon, LLC,_ 704 F. Supp. 2d at 315 (Plaintiff's efforts to protect the exclusivity of his use of the marks weighed in favor of finding secondary meaning); _Eventide Inc. v. DOD Elec. Corp.,_ No. 93 CIV 2713, 1995 WL 239044, at *16 (S.D.N.Y. Apr. 24, 1995) (fact that Plaintiff "consistently policed unauthorized uses of its mark" weighed in favor of secondary meaning).  Lopez has diligently policed unauthorized uses of his

Marks by sending cease and desist letters, bringing suits against the chain retailers that most recently have used the Marks on their T-shirts, and ███████████████████████

███████████████████████████████████████

Defendants seize upon use of the term "Lower East Side" by several unrelated businesses, including a bar and a hotel, and assert that Lopez's use of his Marks has been "anything but exclusive."  Def.'s Br. at 16.  But use of similar marks by third parties in unrelated businesses does not detract from Lopez's exclusive use of his Marks in the apparel market.  *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661-62 (2d Cir. 1970) (rejecting defendant's contention that use of similar marks by third parties diluted plaintiff's exclusive use because the third-party products "range from very different to slightly different products from [plaintiff's]"); *Scarves by Vera, Inc. v. Todo Imps. Ltd.,* 544 F.2d 1167, 1173-1174 (2d Cir. 1976) (stating that third party use of similar marks on unrelated products did not weaken plaintiff's trademark).

Defendants cite only a single apparel seller—zazzle.com—that has used "Lower East Side" and "LES" on clothing.  Def.'s Br. at 16.  Defendants do not, however, contend that zazzle.com, an online-custom printer, has actively promoted these marks or come to be recognized by consumers by this mark.  *See Scarves by Vera, Inc.,* 544 F.2d at 1174 (finding that third-party use of a trademark is not significant where defendants did not introduce evidence that the marks were "well promoted or . . . recognized by consumers.").  Moreover, Lopez does not need to "police every conceivably related use" of his Marks to establish secondary meaning.



*Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 486 F. Supp. 414, 422–23 (S.D.N.Y. 1980).

Total exclusivity is not necessary for a finding of secondary meaning.  *N.Y.C. Triathlon, LLC*,

704 F. Supp. 2d at 331-32 ("[T]he fact that Plaintiff has co-existed with an entity known as New

York Triathlon Club does not, in and of itself, obviate its acquisition of secondary meaning").  In

short, Lopez's length and exclusivity of use weigh in favor of secondary meaning.

> *Advertising*:  To determine whether advertising expenditures weigh in favor of

finding secondary meaning, courts assess the "characteristics of the relevant market."  *Centaur

Commc'ns,* 830 F.2d at 1222.  In *Mortellito v. Nina of California, Inc.,* 335 F. Supp. 1288

(S.D.N.Y. 1972), plaintiff, a needlepoint-canvass designer, sought a preliminary injunction

against a competitor for distributing needle-point canvasses bearing the mark "Nina."  In finding

that the plaintiff's mark had acquired secondary meaning, this court stated that "it is obvious that

[plaintiff] unlike a giant corporation, has not spread her fame into every nook and corner of the

land[, but plaintiff ] has done enough, with her meager means, to become well-known as a

designer in needlepoint canvasses."  *Id.* at 1295.  Although the court did not disclose the amount

plaintiff spent on advertising, it asserted that "[w]hile the volume of [plaintiff's] advertising is not

large it is in keeping with the nature of the needlepoint business, a small industry."  *Id.* at 1291.

> Likewise, in *Centaur Commc'ns*, the court found that advertising expenditures of

only $10,000 over three years weighed in favor of finding secondary meaning because these

advertising efforts "were effective in causing the relevant group of consumers to associate" the

mark with the plaintiff.  830 F.2d at 1222.  *Cf. Jewish Sephardic Yellow Pages, Ltd. v. DAG

Media, Inc.,* 478 F. Supp. 2d 340, 345 (E.D.N.Y. 2007) (finding no secondary meaning where

plaintiff spent thousands of dollars on advertising but advertising was not effective in causing

consumers to associate the mark with plaintiff).

Lopez has effectively marketed products featuring his Marks by engaging in targeted, albeit low-cost, advertising.  He has distributed hundreds of flyers featuring his Marks every year from 1999 to today.  He has utilized his personal and professional connections to promote his Marks by word-of-mouth and through the endorsements of notable musicians and artists.  Lopez Decl. ¶¶ 25-39 and Exs. 23-26; *supra* 2-5.  Lopez has himself worn clothing bearing at least one of his Marks every day from late 2006 to today at private and public events. *Id.* ¶ 28.  And since 2006, Lopez's business has had an online presence thus enabling him to more broadly promote and sell his products.  *Id.* ¶ 19; *Planned Parenthood Fed. of Am., Inc. v. Bucci*, No. 97 Civ. 0629(KMV), 1997 WL 133313, at *3 (S.D.N.Y. March 24, 1997) (noting that "internet users constitute a national, even international, audience"); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1045 (9th Cir. 2009) ("The Internet is a unique medium that offers legitimate businesses a low-cost means to promote themselves and their wares . . . .").  This evidence of targeted advertising, as well as on-line promotion, weighs in favor of finding secondary meaning.

     *Sales Success:* ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████Defendants thus are mistaken when they assert that the "only evidence of Lopez's sales shows just $94.80 in sales prior to Defendants' first offering the Old Navy Women's T-shirt in December 2009."  Def.'s Br. at 15.  Defendants also ignore the fact that Lopez did not maintain records for much of his business during that time.  Lopez Decl. ¶ 22; Ketty Decl. Ex. A at 62:25-63:14.

████████████████████████████████████████

███████████████████████████████Def.'s Br. at 18.  But Defendants may not obtain summary judgment by challenging Lopez's credibility.  *Ideal Steel Supply Corp. v. Anza*, 652

F.3d 310, 326 (2d Cir. 2011) (credibility determinations may not be made at the summary

judgment stage).  Moreover, Lopez's testimony is buttressed by the documentary evidence of his

current sales, for which he is currently keeping regular business records.  ███████████

████████████████████████████████████████████████████ Lopez Decl. ¶ 24.  G████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

The mere fact that he did not keep records of his earlier sales does not disprove that such sales

occurred.

███████████████████████████████████████████████████████████████

███████████████████████████████████ those sales along with other factors should be sufficient

for a factfinder to find secondary meaning for the Marks, particularly considering the limited

geographic area in which Lopez concentrated his sales efforts.  As in *Mortellito*, the Lanham Act

protects small businesses whose sales will inevitably be smaller than that of a mass retailer.[3]  335

F. Supp. at 1295.  Lopez does not dispute that LES Clothing Co.'s production volume is

consistent with a small business.  But that does not trigger summary judgment on secondary

meaning; Lopez need not show sales as high as those of a national retailer to prove that he has

acquired secondary meaning in his local market.

    *Third-Party Copying*:  "[E]vidence that a mark has been widely copied [is]

persuasive evidence that that mark has become distinctive as a source identifier."  *T. Anthony,

Ltd. v. Malletier*, No. 93 Civ. 6900 (KC), 1993 WL 659682, at *3 (S.D.N.Y.  Nov. 24, 1993).

On several occasions, third-parties have made unauthorized use of Lopez's Marks on apparel,

compelling Lopez to take action.  Lopez Decl. ¶ 40.  Defendants have not adduced any evidence

---

[3] In *Mortelito*, the plaintiff achieved sales of $184,000 in one year.  Lopez's sales have been far fewer in
any given year, but that is countered by the fact that he has been selling apparel with his Marks for the last
15 years thus establishing a long-entrenched presence.

that these third parties had a "credible explanation" for the similarity of their products to Lopez's, which had been sold and marketed continuously for years prior. *See Centaur Commc'ns*, 830 F.2d at 1224 (finding that absent a "credible explanation" for defendant's adoption of plaintiff's mark, the obvious similarities between plaintiff's and defendant's marks was telling evidence of copying). This factor thus also weighs in favor of secondary meaning.

*Unsolicited Media Coverage*: Lopez has produced evidence of unsolicited media coverage. LES Clothing Co.'s products have been featured in a Pepsi/Yahoo video "Mic Pass-LES Kids" in 2007 (Lopez Decl. ¶ 37, Ex. 27), Hip-Hop Weekly (*Id.* ¶ 36) and worn by R&B artist Fokis in a photograph accompanying his feature article in the online hip hop publication "Hip Hop Game" (*Id.* ¶ 38, Ex. 28). All of these pre-date the time that Defendants offered and sold the infringing T-shirts.

*Consumer Surveys*: Lopez has not commissioned a consumer survey. Such surveys cost tens of thousands of dollars, and Lopez is a plaintiff of modest means. *Id.* ¶ 53; Ketty Decl. ¶ 5. While consumer surveys can provide evidence of secondary meaning, they are not necessary; courts regularly find secondary meaning without survey evidence. *See, e.g., GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002); *Stern's Miracle-Gro Prods., Inc. v. Sharks Prods. Inc.,* 823 F. Supp. 1077, 1086 (S.D.N.Y. 1993); *Shen Mfg. Co. v. Suncrest Mills, Inc.,* 673 F. Supp. 1199, 1204 (S.D.N.Y. 1987). At best, this factor is neutral, as Defendants have not offered any consumer survey evidence of their own to show that consumers do not associate Lopez's Marks with a single source.

In sum, there is evidence weighing in Lopez's favor for five of the six factors that this court considers to determine whether a mark has acquired secondary meaning, and the sixth factor does not favor either party. Accordingly, Lopez has shown that, or at the least raised an

issue of material fact as to whether, his Marks acquired secondary meaning by January 2011 when Defendants first offered for sale the Men's T-shirt.

> ### 2. There is a Material Issue of Fact as to Whether Lopez's Lower East Side Mark Acquired Secondary Meaning by December 28, 2009

Lopez had been selling and promoting T-Shirts featuring his Lower East Side Mark for 12 years before Defendants' offered their Women's T-Shirt. As described above, during that time Lopez obtained celebrity endorsements for products featuring this Mark and was diligent in protecting the exclusivity of its use. The only notable differences in the factors considered at the time of December 2009 (for the Women's T-shirt) compared to the time of January 2011 (for the Men's T-shirt) are that (a) in 2010, Lopez purchased and employed the domain name "lesclothing.com"—but even prior to 2009 Lopez already had established an Internet presence for his goods with his Myspace page, and (b) Lopez had merely one less year of sales. Accordingly, there are facts supporting secondary meaning for Lopez's Lower East Side Mark by the time Defendants began selling their Women's T-shirt on December 28, 2009.

## II. LOPEZ'S USE OF THE MARKS IS SUFFICIENT FOR PROTECTION

Trademark rights arise from use of a mark. The Lanham Act defines "use in commerce" as "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in the mark." 15 U.S.C. § 1127. Lopez has more than met this threshold.

First, a mark that has acquired secondary meaning necessarily has had sufficient "use." *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 94 (2d Cir. 2001) (stating that a mark has acquired secondary meaning if it developed consumer recognition through use in commerce); *Jewish Sephardic Yellow Pages, Ltd.*, 478 F. Supp. 2d at 347 (explaining that a mark can acquire secondary meaning through continuous use in commerce). By setting forth evidence

that his Marks have secondary meaning, Lopez necessarily has established sufficient evidence of use to require denial of summary judgment on this issue.

Second, the threshold for sufficient use is not high, and Lopez has met this requirement even for the LES Mark, which Lopez began using in commerce in December 2010. Again, the question is whether Lopez has made a "bona fide" use of his Marks in the "ordinary course of trade" and not merely a token use simply to reserve rights in the Marks.  15 U.S.C. §1127.  Cases finding insufficient use are those where the plaintiff had a "meager trickle" of sales or advertising, or sales and marketing that was not continuous or consistent.  *See, e.g., La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271-72 (2d Cir. 1974) (89 sales in 20 years totalling a gross profit of $100 was a "meager trickle of business" and not bona fide use); *Momentum Luggage & Leisure Bags v. Jansport, Inc*., No. 00 Civ. 7909, 2001 WL 830667, at *6 (S.D.N.Y. July 23, 2001) (single sale of product did not constitute bona fide use where it was not followed by "continuous commercial utilization").

While business transactions that are sporadic and inconsequential do not constitute bona fide use, there is no bright line rule as to what level of sales and advertising constitutes sufficient use.  *See, e.g., Sweetarts v. Sunline, Inc*., 380 F.2d 923, 928-29 (8th Cir. 1967) (considering states with sales ranging from $1,000 to $20,000 to have "measurable business" and presenting a genuine factual issue as to whether the states constituted plaintiff's effective market area, unlike states with sales totalling less than $75).  Indeed, even a single small first sale should be counted for purposes of supporting protection of a mark if it is followed by a continually increasing level of sales.  MCCARTHY § 19:109.

Unlike *LaSociete* and *Momentum Luggage*, Lopez's sales and advertising have been far from token.  Lopez has been building a business since 1997.  He has marketed and sold

clothing bearing his Marks consistently every year since then and has steadily grown the business over that course of time.

The cases Defendants rely on are easily distinguishable.  For instance, in *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, the plaintiff never made any "deliberate" or "actual" use of her mark in the sale or advertising of goods or services and "never sought or generated revenue".  470 F. Supp. 2d 365, 371-72 (S.D.N.Y. 2007).  In contrast, Lopez has both deliberately and steadily advertised and sold his goods in commerce and both sought and generated revenue.  In *Gameologist Grp., L.L.C. v. Scientific Games Int'l, Inc.*, the plaintiff had only four documented sales and approximately 250 undocumented sales of his $30 product.  No. 09 Civ. 6261 (JGK), 2011 WL 5075224, at *8 (S.D.N.Y. Oct. 25, 2011).  Lopez on the other hand has been in business selling and promoting apparel with his Marks for 15 years, and ███

███████████████████████████████████████████████████████████████

██████████████████████  Lopez Decl. ¶ 22, Ex. 11; Weinberger Decl. Ex. G.  Far from being "merely to reserve a right in the mark," Lopez's use has been continuous, bona fide use in the ordinary course of establishing, growing and operating a business.

## III.   THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO LIKELIHOOD OF CONFUSION

"Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification."  *Heisman Trophy Trust v. Smack Apparel*, 637 F. Supp. 2d 146, 154 (S.D.N.Y. 2009); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 217 Fed. Appx. 1 (2d Cir. 2005).  Here, confusion as to sponsorship or affiliation is particularly apt.  Consumers who visited Old Navy stores and encountered or purchased Defendants' T-shirts are likely to be confused as to whether Lopez sponsored, licensed or otherwise endorsed Old Navy's T-shirts bearing the Marks.

Moreover, consumer confusion can occur both in a purchase setting and post-purchase setting.  In a purchase setting, if consumers view a junior user's product with a mark so similar to that of the senior user, they are likely to be confused as to whether the senior user licensed, sponsored, or approved the junior user's use of his mark.  Likelihood of confusion must also be evaluated in a post-purchase setting where, as in cases involving apparel such as shirts or pants, the junior user's mark is "consistently visible to the purchasing public as a constant advertisement of the product on which an evaluation of it is affixed."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co*., 631 F. Supp. 735, 747 (S.D.N.Y. 1985), *aff'd,* 799 F.2d 867 (2d Cir. 1986); *see also Clinique Labs., Inc. v. Dep Corp*., 945 F. Supp. 547 (S.D.N.Y. 1996) (finding likelihood of post-sale confusion); *T. Anthony, Ltd. v. Malletier*, 1993 WL 659682, at *3 (same). Both purchase and post-purchase confusion are in play here.

Courts generally consider eight factors to determine the likelihood of confusion. These factors, outlined in *Polaroid Corp. v. Polarad Elecs., Corp*., 287 F.2d 492, 495 (2d Cir. 1961), are: 1) strength of the plaintiff's mark; 2) degree of similarity between the marks; 3) proximity of the parties' goods in the marketplace; 4) likelihood that the plaintiff will bridge any gap between it and the defendant; 5) actual confusion; 6) defendant's intent in adopting its mark; 7) quality of defendant's product; and 8) consumer sophistication.  The list of factors is not exhaustive, and no one factor is dispositive.  *Morningside Grp. Ltd. v. Morningside Capital Grp. LLC*, 182 F.3d 133, 139 (2d Cir. 1999).

Summary judgment is inappropriate here because Defendants have not shown that the undisputed evidence leads only to the conclusion that there is no likelihood of confusion under the *Polaroid* test.  "[I]f a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the

district court may not properly resolve that issue on summary judgment." *GMA Accessories, Inc. v. Croscill, Inc.*, No. 06 Civ. 6236, 2008 WL 591803, at *3 (S.D.N.Y. Mar. 13, 2008) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996)). Moreover, a court should not "apply the test in a rote fashion such that the party with the greatest number of factors wins." *SLY Magazine, LLC v. Weider Publ'ns LLC*, 529 F. Supp. 2d 425, 437 (S.D.N.Y. 2007). Instead, a court should focus on the ultimate question of whether a consumer is likely to be confused. As explained below, there are issues of material fact relating to the *Polaroid* factors and whether consumers are likely to be confused.

Strength of Mark: "A mark's strength can be shown by its inherent distinctiveness, by proof that the mark has secondary meaning, or both." *Artisan Mfg. Corp.*, 559 F. Supp. 2d at 450. As discussed above, Lopez's Lower East Side and LES NYC Marks have acquired secondary meaning and the LES Mark has inherent distinctiveness through its stylization. (*See supra* 8, 16-17). Each of the Marks is strong, with the LES Mark being the strongest, the LES NYC next strongest, and Lower East Side the third strongest.

Similarity of Marks: This factor addresses whether marks are so similar that they are likely to lead to consumer confusion. There is considerable evidence that they are in this case. For example, Defendants' Men's T-shirt features "Lower East Side" in cracked lettering, mirroring Lopez's long-time use of "Lower East Side" in cracked lettering. *See Gucci Am., Inc. v. Gucci,* No. 07 Civ. 6820, 2009 WL 8531026, at *16 (S.D.N.Y. Aug. 5, 2009) (considering similarity of typeface in likelihood of confusion analysis). Even more striking is Defendants' use of the interlocking letters LES in the middle of Defendants' Men's T-Shirt so as to mimic Lopez's LES Mark. *Compare* Lopez Decl. Ex. 5 *with* DeMartini Decl. Ex. A.

Defendants attempt to deflect the similarity of the marks by focusing on three aspects of their marketing:  additional words on the infringing shirts; signage in the Old Navy stores; and labeling of the Old Navy shirts.  None of these diminish the likelihood of confusion.

The mere addition of words to a mark does not remove potential confusion among consumers.  *See N.Y.C. Triathlon LLC*, 704 F. Supp. 2d at 317 ("It is the general rule that one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter."); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) (finding "First Ladies of Chic" sufficiently similar to "Chic" so as to cause confusion); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F. Supp. 729, 733 (E.D.N.Y. 1991) (addition of descriptive words to a name did not erase the similarities between the marks).  Defendants thus gain no ground in arguing that the marks are not similar because Defendants include "New York Sports Club" on the Men's T-shirt while Lopez does not include that phrase on his shirts.  Def.'s Br. at 20.

Defendants next point to the Old Navy signage on their stores, suggesting that when a customer buys a shirt at an Old Navy store, they know they are getting an Old Navy product.  *Id*.  This does not change the similarity analysis; regardless of where the products are sold, the marks are still strikingly similar.  Moreover, the presence of the Old Navy signage is likely to increase likelihood of confusion as to sponsorship or affiliation.  Old Navy sells various shirts bearing well-known trademarked images and words such as Star Wars[TM] and Hello Kitty[TM].  Ketty Decl. Ex. 2.  Consumers are therefore primed to expect that what appears on Old Navy apparel has been licensed, endorsed or otherwise approved by the rightful mark owner. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979) ("[t]he public's belief that the mark's owner sponsored or otherwise approved the use of

the trademark satisfies the confusion requirement").  Defendants' argument also ignores the likelihood of post-purchase confusion, specifically that a potential consumer will see the infringing shirts bearing Lopez's Marks being worn by others and be confused as to their source, sponsorship, or affiliation.  *Lois Sportswear, U.S.A., Inc.*, 631 F. Supp. at 747; *Clinique Labs.*, 945 F. Supp. at 551; *T. Anthony, Ltd. v. Malletier*, 1993 WL 659682 at *4.

Confusion is no less likely, as Defendants would have it, because the "Old Navy" house mark appears on their shirts.  Def.'s Br. at 20.  That is so for at least two reasons.  First, the presence of the house mark does not remove the likelihood of confusion as to sponsorship or affiliation.  Second, the Old Navy house marks appear on a removable hang-tag and an interior tag on the inside of the shirt (DeMartini Decl. ¶ 12); they are not displayed on the outside of the shirt that is visible to consumers or persons encountering the Defendants' T-shirts in the post-purchase context.  Thus, even assuming that this tag is readily visible to consumers at the time of purchase or of such prominence as to affect a consumer's overall impression of the mark at the time of purchase, which is unlikely, it does not remove post-purchase confusion.

*Competitive Proximity*:  Lopez and Defendant operate in the same area of commerce—they both produce and sell graphic T-shirts.  Courts frequently find that articles of clothing containing similar marks are likely to cause confusion.  *See, e.g., Lois Sportswear, U.S.A., Inc.,* 799 F.2d at 748; *Gucci Am., Inc. v. Action Activewear*, 759 F. Supp. 1060 (S.D.N.Y. 1991); *Guess ?, Inc. v. Mai-Tai Boutique*, No. 85 Civ. 9254 (JES), 1988 WL 31878, at *2 (S.D.N.Y. March 30, 1988).  The likelihood of confusion is heightened even more by the fact that Defendants' and Lopez's T-shirts are similar in style (they are both casual, graphic T-shirts) and price point (they are low cost items, not high-priced fashion wear).

Moreover, both Old Navy and Lopez sell their apparel in Manhattan,[4] and both offer their apparel through websites.  Defendants make the odd argument that because Lopez does not sell his clothing in Old Navy's stores or on its website, the competitive proximity between the parties' products is slim.  Def.'s Br. at 21.  That argument has been rejected.  *See Cartier, Inc. v. Sardell Jewelry, Inc*., 294 Fed. Appx. 615, 619-20 (2d Cir. 2008) (rejecting defendant's argument that because Cartier watches cannot be sold in the same stores as plaintiff's watches, they do not occupy the same market as plaintiff).  As discussed above, the likelihood of point-of-purchase confusion as to sponsorship or approval, and post-purchase confusion as to source as well as sponsorship or approval, exists regardless of Old Navy's labeling and stores.[5]

*Bridging the Gap*:  This factor examines the likelihood that a plaintiff who is not in direct competition with the defendant will later expand its business to bridge the gap between its business and defendant's, thereby entering the defendant's market.  *Kookai, S.A. v. Shabo*, 950 F. Supp. 605, 608 (S.D.N.Y. 1997).  Defendants once again miss the mark by arguing that this factor weighs in their favor because Lopez cannot sell his goods at Old Navy's stores or website.  Def.'s Br. at 21.  There is no gap to bridge: Lopez and Defendants both sell graphic design T-shirts, with similar marks, to the same market.  *See Cartier,* 294 Fed. Appx. at 619-20 (parties occupied the same market by selling ladieswear, even though one party operated 33 retail clothing stores, and the other party operated just one retail store of its own); *see also Kookai*, 950 F. Supp. at 608 (this factor weighed in favor of plaintiff because the parties both sold clothing and accessories to young women).

---

[4] Per Old Navy's website, Defendants operate Old Navy stores at 503 Broadway and at 610 Avenue of the Americas, 144-150 West 34th Street, 517 East 117th Street, and 300 West 125th Street in Manhattan.  Ketty Decl. Ex. 3.

[5] At his deposition, Lopez agreed that Old Navy's customer base was not what he aspired to have as his customer base, but at the same time he testified that he views anyone as a potential customer.  Ketty Decl. Ex. A. at 135:25-136:3.

*Actual Confusion*:  Although actual confusion among consumers may be considered in the *Polaroid* analysis, the Second Circuit has explained that "evidence of actual confusion is not required to prove the likelihood of confusion between two marks." *Centaur Commc'ns, Ltd.*, 830 F.2d at 1227; *see also N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 318 (explaining that plaintiff need not prove any instances of actual confusion because the test of infringement is the likelihood of confusion, not proof of actual confusion).  Indeed, likelihood of confusion has been found without evidence of actual confusion.  *See, e.g., Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988); *Pfizer Inc. v. Sachs,* 652 F. Supp. 2d 512 (S.D.N.Y. 2009).  Especially when, as here, the Defendants' products were available for only a relatively short time—Defendants' Men's T-Shirt was sold for only a matter of months—the absence of proof of actual confusion is not significant.  *Centaur Commc'ns, Ltd*, 830 F.2d at 1227 (absence of proof of actual confusion was "not especially significant" given the mere four months before trial that the marks were competing).

*Bad Faith*:  This factor examines the intent behind a defendant's adoption and use of the infringing mark.  As an initial matter, the issue of a defendant's intent and good faith "ultimately turns on the credibility of defendants' witnesses and the inferences to be drawn from their testimony"; such issues therefore generally are inappropriate for determination on summary judgment.  *GMA Accessories, Inc.*, 2008 WL 591803 at *8, quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996).

In any event, whether Defendants adopted Lopez's Marks with the intent of capitalizing on Lopez's goodwill and reputation is still a matter of dispute because Defendants have not provided discovery regarding design, creation, or adoption of the marks on the infringing T-shirts.  *Star Indus.*, 412 F.3d at 388.  While representing himself *pro se*, Lopez

served document requests specifically addressing this subject.  Ketty Decl. ¶ 8, Ex. 4 (Request

Nos. 1, 7 & 9).  Defendants produced little in response to these requests.[6]  After obtaining *pro*

*bono* counsel,[7] Lopez requested compliance with his requests.  *See id.* Ex. 10.  In addition, Lopez

requested that Defendants produce for deposition persons with knowledge of the design, creation

and adoption of the infringing marks.  Lopez suggested that Defendants defer their summary

judgment motion until this discovery was had and expressly reserved his right to seek relief

under F.R.C.P. 56(d) if Defendants refused.  *Id.*  Defendants did exactly that and even threatened

to pursue costs against Lopez in response to this inquiry.  *See id.*, Ex. 11.

   Even without proof of bad faith, the evidence available on the remainder of the

*Polaroid* factors requires denial of summary judgment.  If, however, the Court deems

consideration of this *Polaroid* factor necessary to make a determination, then the motion should

be held in abeyance pending limited discovery on this issue pursuant to F.R.C.P. 56(d).  *See, e.g.,*

*Katz v. Adecco USA, Inc.*, No. 11 Civ. 2540, 2011 WL 2436670, at *2 (S.D.N.Y. June 16, 2011)

(denying summary judgment to grant plaintiff time to conclude discovery on a limited issue);

*Coach Leatherware Co. Inc. v. Ann Taylor*, *Inc.,* 933 F.2d 162, 169 (2d Cir. 1991) ("The case

against summary judgment is even stronger where the opposing party has not been afforded the

opportunity to seek potentially favorable information.").

   Facts relating to Defendants' design and intent in creating the T-shirts in question

bear directly on the bad faith factor.  The striking similarity between Defendants' Men's T-shirt

and Lopez's stylized LES Mark itself raises suspicion as to bad faith, particularly given that

---

[6] Defendant produced some documents that appear to touch on the color combinations and font style for the T-shirts in question, but these document do not address the design, creation, or adoption of the phrases Lower East Side, LES NYC, LES or the particular stylized logo that so resembles Lopez's LES Mark. *See* Ketty Decl. ¶ 15, Ex. 9.

[7] Plaintiff appeared *pro se* during much of this lawsuit. Discovery closed on January 10, 2011.  Ketty Decl. ¶ 8.  *Pro bono* counsel was not secured until February 16, 2012.  *Id.* ¶ 17.

Defendants have not submitted any affidavit or proof of independent creation. *See Centaur Commc'ns*, 830 F.2d at 1224 (obvious similarities between plaintiff's and defendant's products, without a credible explanation, is "telling evidence" of copying). Meanwhile, Defendants repeatedly have rebuffed Lopez's attempts to gain discovery on this subject. The court should permit discovery on this narrow issue and defer decision on Defendants' motion until the discovery has been had.

      <u>*Quality of Defendants' Product*</u>: This factor examines the quality of a junior user's product in comparison to the senior user's. Where the products are of similar quality, there is less to distinguish their source and thus a greater likelihood of confusion. *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 537 (S.D.N.Y. 2011); *Morningside Group Ltd.*, 182 F.3d at 142. Defendants do not contend that their products are of different quality than Lopez's. *See* Def.'s Br. at 22. This factor weighs in favor of a likelihood of confusion.

      At the same time, this factor is concerned with the loss of control over the reputation of a senior user's product. *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 152 (2d Cir. 2003) ("The issue of the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion."); *N.Y.C. Triathlon, LLC,* 704 F. Supp. 2d at 340-41 (examining the harm that confusion could cause the plaintiff's mark and reputation when analyzing Polaroid factor regarding quality of defendant's products). "A senior user is not required to put its reputation in a junior user's hands, no matter how capable those hands may be." *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 537 (internal citations and quotation omitted). This threat is palpable here. As Lopez explained during his deposition, his credibility "would be shot" in his community if he were associated with Old Navy products. Ketty Decl. Ex. A at 256:18-24, 257:8-258:5.

*Consumer Sophistication*:  This factor looks to the sophistication of the relevant consumer to determine the likelihood that s/he would be confused or misled by the similarity of the different products at issue.  *See THOIP*, 736 F. Supp. 2d at 714-15; *CJ Prods. LLC v Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 155-56 (E.D.N.Y. 2011).  Generally speaking, a trained professional is less likely to be confused than an ordinary retail customer, and, the less expensive the product, the less sophisticated the retail consumer is presumed to be.  *See CJ Prods. LLC,* 809 F. Supp. 2d at 155-56 (purchasing inexpensive toys for children does not require any sophistication on the part of the buyer); *Pretty Girl v. Pretty Girl Fashion, Inc.*, 778 F. Supp. 2d 261, 269 (E.D.N.Y. 2011) (purchasing "fashionable yet affordable ladieswear" does not require any heightened degree of sophistication) (abrogated on other grounds).

The products at issue here, T-shirts, are relatively inexpensive—generally $30 for Lopez's shirts and even less for Defendants.  Ketty Decl. Ex. A at 306:20-307:11, Ex. 8 (Response to Interrogatory No. 9).  Furthermore, "the average clothing customer is not particularly sophisticated."  *Phillips-Van Heusen Corp. v. Calvin Clothing Corp*., 444 F. Supp. 2d 250, 257 (S.D.N.Y. 2006).  While Lopez testified that he believes consumers care about the brands they wear and how they look, (Ketty Decl. Ex. A at 259:13-21), that does not render them less susceptible to confusion as to source, sponsorship or affiliation.  *See THOIP Holding Co.*, 736 F. Supp. 2d at 714-15 ("[T]he relatively inexpensive T-shirts here do not call for any degree of sophistication that would warrant viewing this factor in [defendant's] favor.").  In short, the evidence on this factor weighs in favor of likelihood of confusion.

Taking account of all the *Polaroid* factors, there is considerable evidence of likelihood of confusion, both as to source and sponsorship or affiliation, and both at the point of

purchase and post-purchase.  At the very least, there are genuine issues of material fact as to whether there is a likelihood of confusion among consumers.

## IV.     THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER DEFENDANTS' USE OF THE MARKS CONSTITUTES "FAIR USE"

To show that use of a trademark is "fair" under this defense, Defendants must establish that they are using the mark 1) descriptively, 2) other than as a mark, and 3) in good faith.  15 U.S.C. § 1115(b)(4); *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 309 (S.D.N.Y. 2010).  The fair use defense is generally allowed so that junior users can use a descriptive term to describe a characteristic or geographic origin of the goods or services they offer.  *See, e.g., U.S. Shoe Corp. v. Brown Group, Inc.*, 740 F. Supp. 196, 198 (S.D.N.Y. 1990) (NaturalSport's use of phrase "feels like a sneaker," constituted fair use because it was used to describe characteristics of its shoes); *Am. Olean Tile Co., Inc. v. Am. Marazzi Tile, Inc.*, No. 86-3089, 1988 WL 29056, *8 (E.D. Pa. 1988) (use of "American" in "American Marazzi" was fair use because it was used to describe Marazzi as a non-foreign United States corporation).

There is a genuine issue of material fact as to all three elements of Defendants' fair use defense, any one of which would require denial of summary judgment.  First, Old Navy's goods have no affiliation or association with the Lower East Side neighborhood.  The Lower East Side does not describe the geographic location or origin of Old Navy's T-shirt or products generally, nor does it describe any characteristic of the product.  Defendants did not use the Lower East Side or LES Marks descriptively or in any fashion other than as a mark.  Accordingly, neither of the first two elements of the defense are satisfied.  At best for Defendants, there is a genuine issue of material fact as to whether Defendants' T-shirts use the Marks descriptively and not as source identifiers.  *See, e.g., Deer Park Spring Water, Inc. v.*

*Appalachian Mountain Spring Water Co.*, 762 F. Supp. 62 (S.D.N.Y. 1991) (denying summary

judgment because there was a genuine dispute of fact as to whether Appalachian's use of "Deer

Park" was a good faith effort to describe the geographic origin of its water).

As for the third element—good faith—the same concern exists as with the good

faith factor under the likelihood of confusion analysis.  Discovery of Defendants is necessary and

should be permitted pursuant to F.R.C.P. 56(d).  As noted, however, because there are disputed

issues of fact on the first two elements of this defense, the Court already has ample ground to

deny summary judgment on the fair use defense.

## CONCLUSION

Genuine issues of material fact exist as to whether Lopez's marks are protectable,

whether consumers are likely to be confused, and whether Defendants' use of the marks

constitute fair use.  Defendants' motion for summary judgment should be denied.

Dated: New York, New York
      May 7, 2012

                    Respectfully submitted,

                    PATTERSON BELKNAP WEBB & TYLER LLP

                    By: _____
                    Robert W. Lehrburger
                    Nivritha C. Ketty
                    Solmaz F. Firoz
                    1133 Avenue of the Americas
                    New York, New York 10036-6710

                    Attorneys for Robert G. Lopez