UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                  :

ROBERT G. LOPEZ,                            :

                       Plaintiff,       :        11 Civ. 3185 (PAE)

                                   :

           -v-                      :        <u>OPINION & ORDER</u>

                                   :

THE GAP, INC. et al.,                    :

                                   :

                       Defendants.     :

                                   :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Robert G. Lopez brings this claim against The Gap, Inc., Gap International Sourcing, Inc., Old Navy, LLC, and Old Navy Apparel, LLC (collectively, "Defendants"). Lopez alleges that Defendants infringed his ownership and use rights in the marks "Lower East Side," "LES NYC," and "LES," resulting in unfair competition and false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law trademark infringement and unfair competition in violation of New York State law. Lopez seeks to enjoin Defendants from using the allegedly infringing marks, to destroy any remaining materials bearing the marks, and to notify past and present customers that Defendants have been improperly using the marks. Lopez also seeks to disgorge Defendants of the profits arising from their use of the allegedly infringing marks. Finally, he seeks treble damages, punitive damages, and attorney's fees.

      Defendants move for summary judgment as to all claims. For the reasons set forth below, Defendants' motion is granted.

I.      **Background**[1]

A.  **L.E.S. Clothing Co.**

This case involves one neighborhood, two t-shirts, and three marks.  Lopez, a resident of the Lower East Side neighborhood of Manhattan, started doing business as L.E.S. Clothing Co. in 1999.[2]  Defs. 56.1 ¶ 2; Pl. 56.1 ¶ 1.  In an effort to create designs that customers perceive as representing the Lower East Side, Lopez began selling t-shirts bearing the marks "Lower East Side" (the "Lower East Side Mark") and "LES NYC" (the "LES NYC Mark").  Defs. 56.1 ¶ 12; Pl. 56.1 ¶¶ 2, 12.  The Lower East Side Mark is a mark consisting of the words "Lower East Side," with "Lower" on line one, "East" on line two, and "Side" on line three.  *See infra* p. 3. There is a solid line above "Lower," and a solid line below "Side."  The LES NYC Mark consists of the phrase "LES NYC" inside a circle of stars.  *See infra* p. 3.

In 2006 or 2007, Lopez expanded his product line to include various other products, including sweatshirts, vests, and caps.  Defs. 56.1 ¶ 6; Pl. 56.1 ¶ 6.  In December 2010, he also began using a third mark, the "LES Mark."  Lopez Decl. ¶ 11.  The LES Mark consists of the three capital letters:  "L," "E," and "S."  *See id.* Ex. 5.  The letters appear in a design in which the lower portion of the "L" serves as the middle portion of the "E" and the lower portion of the "E" serves as the bottom portion of the "S."  *See infra* p. 3.  The LES Mark appears with a star in the

---

[1] The Court's account of the underlying facts is drawn from the Declaration of Michelle DeMartini in Support of Defendants' Motion for Summary Judgment ("DeMartini Decl.") (Dkt. 37) and attached exhibits; the Declaration of James D. Weinberger in Support of Defendants' Motion for Summary Judgment ("Weinberger Decl.") (Dkt. 38) and attached exhibits; the Declaration of Robert G. Lopez in Opposition to Defendants' Motion for Summary Judgment ("Lopez Decl.") (Dkt. 45) and attached exhibits; the Declaration of Nivritha C. Ketty in Opposition to Defendants' Motion for Summary Judgment ("Ketty Decl.") (Dkt. 47) and attached exhibits; the Defendants' Local Rule 56.1 Statement ("Defs. 56.1") (Dkt. 39); and Lopez's Local Rule 56.1 Counter Statement ("Pl. 56.1") (Dkt. 43).  Unless otherwise noted, the facts are not disputed.

[2] Although Lopez began doing business as L.E.S. Clothing Co. in 1999, he began selling t-shirts bearing these phrases around 1997.  Pl. 56.1 ¶ 2.

upper right corner, near the top of the "S." These three marks—the Lower East Side Mark, the

LES NYC Mark, and the LES Mark—form the basis of this action.

**Lopez's Three Marks**



| Lower East Side | LES NYC | LES |

Before selling his products in a retail store in 2012, Lopez sold his merchandise on the

street, in barbershops, and in locally owned clothing stores. *See* Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25.[3]

He also made occasional sales through a PayPal account beginning in 2006, Lopez Decl. ¶ 19,

and using a toll-free number that he purchased in 2009, *id*. ¶ 20. L.E.S. Clothing Co. has never

had any employees. Defs. 56.1 ¶ 7; Pl. 56.1 ¶ 7. Instead, Lopez has occasionally solicited help

from and compensated various individuals, some of whom are his friends and acquaintances, to

design, create, print, and market his apparel. Pl. 56.1 ¶¶ 7–8. In 2010, Lopez also purchased the

domain name www.lesclothing.com, a website that allows potential consumers to view and

purchase his products. Lopez Decl. ¶ 21.

Since the inception of L.E.S. Clothing Co., the majority of Lopez's business transactions

have been in cash. Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25. In fact, before February 2012, Lopez did not

---

[3] Defendants dispute Lopez's assertion that he opened a retail store in February 2012. Lopez asserts that he "opened a retail store at 43 Clinton Street in Manhattan" on February 1, 2012, Lopez Decl. ¶ 23. More precisely, Lopez "reached a co-op agreement" with the owner of another store that he had previously sued, whereby Lopez and the owner of that store "share the Clinton Street retail space and all related expenses." Declaration of Anna P. Leipsic in Support of Defendants' Reply in Support of Motion for Summary Judgment ("Leipsic Decl.") (Dkt. 52) Ex. F.

create business records of his sales.  Pl. 56.1 ¶ 27.  As partial documentation of his sales during

this time period, he has produced sales receipts totaling $1,129.08 from Paypal orders: $40.00

from 2007; $54.80 from 2008; and the remainder from 2011.  *Id*.; Weinberger Decl. Ex. E.

Although he does not know the precise number of clothing units sold for any particular year,

Lopez estimates that his annual sales ranged from $6,000 to $10,000 between 2007 and 2011,

never exceeding $10,000 for any given year.  Defs. 56.1 ¶¶ 35, 40; Pl. 56.1 ¶¶ 35, 40.  Finally,

the 2010 Schedule C filed with the IRS for L.E.S. Clothing Co. shows sales totaling $2,000 for

2010.  Defs. 56.1 ¶ 36; Pl. 56.1 ¶ 36.

 Before commencing this action, Lopez took steps to protect his Lower East Side Mark

and his LES NYC Mark.  In 2007, he obtained a New York State trademark registration for the

Lower East Side Mark; in 2008, he received a New York State trademark registration for the

LES NYC Mark.  Lopez Decl. Exs. 2, 4.  After the commencement of this action, on August 31,

2011, Lopez also obtained a New York State trademark registration for the LES Mark.  *Id*. Ex. 5.

The United States Patent and Trademark Office ("USPTO"), however, refused Lopez's federal

trademark application for the LES NYC Mark on September 19, 2011, noting that the "proposed

mark is primarily geographically descriptive of the origin of the applicant's goods."  Weinberger

Decl. Ex. I.  As of the date of this Order, Lopez's USPTO application is suspended.  *Id*. Ex. J;

*see* USPTO website, http://tarr.uspto.gov, serial no: 85335314 (last visited July 26, 2012).

 On a number of occasions, Lopez has sent cease-and-desist letters to website owners

selling non-Lopez produced "Lower East Side" and "LES" apparel.  Defs. 56.1 ¶ 48; Pl. 56.1 ¶

48.  Lopez is also no stranger to the judicial system.  In addition to this lawsuit, he has brought

five *pro se* lawsuits, against: Payless Shoesource Worldwide, Inc.; Aeropostale, Inc. and

Aeropostale Procurement Company, Inc.; J. Crew International, Inc., J. Crew Group, Inc., and J.

Crew Inc.; Urban Outfitters, Inc. and Fifth Sun, LLC; and Coat of Arms, LLC, Hanesbrands, Inc., and Mitchell & Ness Nostaligia, Co.  Defs. 56.1 ¶ 50; Pl. 56.1 ¶ 50.[4]  All lawsuits were based on Lopez's claimed rights in the Lower East Side Mark and the LES NYC Mark.  In none of these prior lawsuits did a court reach the merits of any claim by Lopez to a right in the marks. Defs. 56.1 ¶ 53; Pl. 56.1 ¶ 53.

With respect to advertising, since 1999, Lopez has promoted his products in a variety of ways, including: distributing flyers and stickers of his marks, Lopez Decl. Exs. 15–18; wearing his products to events "virtually every day since late 2006," Pl. 56.1 ¶ 22; and advertising in at least two magazines, *id*.[5]  Aspiring musicians have worn Lopez's clothing during performances, Lopez Decl. Ex. 25, in self-made videos, *id*. Ex. 27, and in the online publication, "Hip Hop Game," *id*. Ex. 28.  Lopez, however, has not maintained records of advertising expenditures, nor conducted market research to determine the number of consumers who are aware of his brand. Defs. 56.1 ¶¶ 22–23; Pl. 56.1 ¶¶ 22–23.  Additionally, under a January 2011 settlement agreement with another retailer, Lopez is restricted from conducting advertising, marketing, promotion, or sales activity outside New York State as to items bearing the Lower East Side Mark, or confusingly similar variations thereof.  Weinberger Decl. Ex. K.  The settlement also

---

[4] The Court takes judicial notice of the fact that, on June 16, 2012, Lopez also filed a complaint against Macy's.com, Inc., alleging unfair competition and false designation of origin under § 43(a) of the Lanham Act, common law trademark infringement and unfair competition under New York law, and unjust enrichment under New York law.  *See* Complaint, *Lopez v. Macy's.com, Inc.*, No. 12-cv-4621 (Dkt. 1) (June 13, 2012).

[5] Lopez and Defendants dispute the specifics of the promotional timeline.  Defendants point to Lopez's deposition in which he testified that, before 2006, the majority of his promotional activities took place "through word of mouth."  Weinberger Decl. Ex. A (Deposition of Robert Lopez ("Lopez Dep.")) 119–20.  Lopez, however, later states in his Rule 56.1 Counter Statement that he has been distributing flyers since 1999 and received "celebrity endorsement" as early as 2004.  Pl. 56.1 ¶ 17.

prohibits Lopez from ever filing a federal trademark application for the term "Lower East Side." *Id*.

Lopez's lawsuits have been covered by several news sources.  Taken together, this coverage has provided "the largest amount of press his business has received for any one event or related group of events."  Defs. 56.1 ¶ 64; Pl. 56.1 ¶ 64.

**B.  Old Navy**

Old Navy Apparel, LLC and Old Navy, LLC (together, "Old Navy")—subsidiaries of The Gap, Inc.—have sold casual apparel under the Old Navy brand since 1994.  Defs. 56.1 ¶ 65; Pl. 56.1 ¶ 65.  Old Navy products are sold nationwide both in Old Navy's full-priced retail store and through Old Navy's website.  Defs. 56.1 ¶ 66; Pl. 56.1 ¶ 66.  Each Old Navy product displays the "Old Navy" mark on a hangtag and also on the interior label.  Defs. 56.1 ¶ 67; Pl. 56.1 ¶ 67.

This case involves the designs used by Old Navy on two of its casual t-shirts.  On December 28, 2009, Old Navy began offering a women's t-shirt displaying the words "Lower East Side NYC" (the "Women's T-Shirt").  Defs. 56.1 ¶ 70; Pl. 56.1 ¶ 70.  The letters appeared in cursive script, adjacent to a multi-colored, pastel flower.  DeMartini Decl. Ex. B; *see infra* p. 7.  In January 2011, Old Navy also began carrying a men's t-shirt (the "Men's T-Shirt").  Defs. 56.1 ¶ 70; Pl. 56.1 ¶ 70.  The Men's T-Shirt is a sporty shirt, bearing the logo of a (fictitious) "Lower East Side Sports Club."  DeMartini Decl. Ex. A.  At the center of the Men's T-shirt there are three overlapping letters—"L," "E," and "S."  The lower portion of the "L" runs through the middle portion of the "E," and the "S" overlaps portions of both the "L" and the "E."  *Id.*[6]  Unlike Lopez's LES Mark, the letters do not interlock.  *See infra* p. 7.  The overlapping letters appear in

_____

[6] At oral argument, Defendants' counsel described the Men's T-shirt as displaying a logo "kind of in the style like the San Francisco Giants."  Oral Argument Transcript, June 5, 2012 ("Tr.") 25.  At the risk of sparking litigation between Old Navy and Major League Baseball, the Court agrees that this comparison is, broadly, valid.

the center of a circle; the circle is comprised of the phrases "Lower East Side," "Sport Club," and "New York."  DeMartini Decl. Ex. A.  Although Old Navy no longer carries either t-shirt, Old Navy sold a combined total of 71,522 units of the t-shirts while they were in stock.  Defs. 56.1 ¶ 71; Pl. 56.1 ¶ 71.

**Old Navy's T-Shirts**

     

**The Women's T-Shirt**                    **The Men's T-Shirt**

### C.  Procedural History

In April 2011, Lopez learned that Old Navy was selling the Men's T-Shirt.[7]  On May 5, 2011, Lopez, proceeding *pro se*, filed this action (Dkt. 1).  The Complaint stated four causes of action: (1) federal trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) federal unfair competition and false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) common law trademark infringement and unfair competition under New York State law; and (4) unjust enrichment under New York State law.  On September 7, 2011, Lopez amended the Complaint, adding claims of copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, and conversion under New York State law (Dkt. 13).  On January 18, 2012, this Court, pursuant to a stipulation signed by all parties, dismissed with prejudice Lopez's claims for (1) federal trademark infringement under § 32(1) of the Lanham Act

---

[7] It was not until the discovery phase of this litigation that Lopez became aware of Old Navy's sale of the Women's T-Shirt.

and (2) federal copyright infringement (Dkt. 26).  On June 5, 2012, at oral argument on Defendants' motion, Lopez—now represented by court-appointed *pro bono* counsel—agreed to voluntarily dismiss the state law claims for unjust enrichment and conversion.  Tr. 62.[8]

The ensuing analysis addresses Defendants' motion for summary judgment on Lopez's two remaining claims, for: (1) federal unfair competition and false designation of origin under § 43(a) of the Lanham Act, and (2) common law trademark infringement and unfair competition under New York State law.

## II.   Applicable Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a material factual question, and, in making this determination, a court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  As to any claim on which the opposing party bears the burden of proof at trial, the movant may discharge its burden by demonstrating that there is insufficient evidence to support the moving party's claim.  *See Celotex*, 477 U.S. at 322–23.

If the moving party meets this burden, the nonmoving party must then establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are

---

[8] The Court commends and thanks Patterson Belknap Webb & Tyler LLP for taking on the *pro bono* representation of Lopez, at the Court's request.  Counsel's written submissions and oral argument were both of extremely high quality.

not credible . . . ."  *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 532 (2d Cir. 1993); *see also*

*Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("A party may not rely on mere speculation or

conjecture as to the true nature of the facts to overcome a motion for summary judgment.").

Only disputes over "facts that might affect the outcome of the suit under the governing law" will

preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  If factual disputes remain, the district court must "resolve all ambiguities" and "draw all

reasonable inferences" in favor of the nonmoving party.  *Clarke v. Aetna Life Ins. Co.*, 471 F.

Supp. 2d 463, 468–69 (S.D.N.Y. 2007) (citing *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d

725, 728 (2d Cir. 1994)) (internal quotation marks omitted).

## III.    Discussion

Section 43(a)(1)(A) of the Lanham Act protects registered and unregistered marks against

the use of any word, term, name, symbol, or device that "is likely to cause confusion, or to cause

mistake, or to deceive as to the affiliation, connection, or association of such person with another

person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial

activities by another person . . . ."  15 U.S.C. § 1125(a).  To establish a claim under this

provision, a plaintiff must show that he or she has a valid mark that is entitled to protection and

that the defendant's actions are likely to cause confusion with the plaintiff's mark.  *See, e.g.*,

*Morningside Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d 133, 137 (2d Cir. 1999).

Defendants make a number of arguments in support of summary judgment, including

that: (1) Lopez failed to claim trademark rights in the LES Mark in his Complaint and his First

Amended Complaint ("FAC"); (2) Lopez's marks are not protectable under the Lanham Act,

either because the mark lacks inherent distinctiveness (the LES Mark) or because Lopez has

failed to raise a genuine issue of material fact that the marks have acquired secondary meaning

(the Lower East Side Mark and the LES NYC Mark); (3) Lopez has not produced sufficient

proof of the use in commerce of any of the three marks; (4) Lopez has not come forward with

evidence that consumers are likely to be confused as to Lopez's sponsorship of, connection to, or

association with Defendants' t-shirts; and (5) Defendants' use of the terms "Lower East Side"

and "LES" constitute fair use of these geographic terms.

The discussion that follows is divided into three parts.  First, the Court considers Lopez's

claims under § 43(a) of Lanham Act with respect to the LES Mark, beginning with whether that

mark is appropriately part of this lawsuit.  Second, the Court considers Lopez's Lanham Act

claims with respect to the Lower East Side Mark and the LES NYC Mark.  Finally, the Court

analyzes Lopez's state law trademark infringement and unfair competition claims as to all three

marks.

### A.  The LES Mark

#### 1.  Inclusion of the LES Mark in this Lawsuit

As an initial matter, Defendants argue that the Court should disregard the interlocking

LES Mark in considering Lopez's trademark claims, because he did not make such claims in

either the Complaint or the FAC, and indeed explicitly disavowed pursuing any trademark rights

in the LES Mark during discovery.  The Court agrees.  It is "well settled that a Court should not

on summary judgment consider factual allegations and legal theories not raised in the

complaint."  *Brown v. Magistro*, No. 10-cv-3705, 2011 WL 6399514, at *3 (S.D.N.Y. Dec. 20,

2011); *see also Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452, 2004 WL

2914093, at *6 (S.D.N.Y. Dec. 15, 2004) (noting that "[a] complaint cannot be amended merely

by raising new facts and theories in plaintiffs' opposition papers").  "[C]ourts in this District

have consistently ruled that 'it is inappropriate to raise new claims for the first time in

submissions in opposition to summary judgment.'" *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d

394, 407 (S.D.N.Y. 2000) (quoting *Bonnie & Co. Fashions v. Bankers Trust Co.*, 170 F.R.D.

111, 119 (S.D.N.Y. 1997)).

Because Lopez was initially proceeding *pro se*, the Court has read his "papers liberally[,]

. . . interpret[ing] them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*,

14 F.3d 787, 790 (2d Cir. 1994).  But, although leniency is afforded a *pro se* litigant, "all normal

rules of pleading are not absolutely suspended." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 462–

63 (N.D.N.Y. 2009) (quoting *Stinson v. Sheriff's Dep't of Sullivan Cty.*, 499 F. Supp. 259, 262 &

n.9 (S.D.N.Y. 1980)).

Here, Lopez's FAC references the interlocking LES Mark only in the context of claims

he has now voluntarily dismissed: his copyright infringement claim, brought under 17 U.S.C.

§101 *et seq.*, and his conversion claim, brought under New York State law.  *See* FAC 8–9; *see*

*also* Stipulation of Dismissal (Dkt. 26) (dismissing copyright infringement claim with prejudice);

Tr. 62 (voluntarily dismissing the state law conversion claim).  In his responses to

interrogatories, Lopez disclaimed asserting that the interlocking LES Mark was a subject of his

trademark claims.  *See* Leipsic Decl. Ex. B, at 4, No. 12 ("Plaintiff . . . asserts that the mark LES

is not the subject of this lawsuit so your inquiry is irrelevant to the present case.").  Finally,

during his deposition on January 10, 2012, Lopez was asked:  "So LES is not the subject of this

case?"  Lopez Dep. 305.  In response, Lopez answered, "No, it's not."  *Id*.  He thereupon

clarified that the interlocking LES Mark related solely to his copyright claim.  *Id*. ("Q: So you do

not have a trademark claim against the Old Navy T-shirt for the overlapping LES design? A:

That's a copyright claim . . . .").

Although it is true that Lopez was proceeding *pro se* both at his deposition and when filing the FAC, the Court cannot overlook the fact that he repeatedly represented that he was not asserting trademark rights in the LES Mark.  The FAC, the interrogatories, and Lopez's deposition testimony, taken together, preclude trademark claims based on the LES Mark.

In any event, on the merits, the Court concludes that any claim of trademark protection for the LES Mark would be substantively deficient, counseling in favor of denying, without leave to amend, Lopez's trademark claim as to that mark.  *See Cusamano*, 604 F. Supp. 2d at 462 (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile)); *see also Freeman v. Marine Midland Bank-New York*, 494 F.2d 1334, 1338 (2d Cir. 1974) (no abuse of discretion by trial court when proffered amendment would fail to state a claim); Tr. 65 (statement of defense counsel, acknowledging that, notwithstanding Lopez's failure to plead a trademark claim as to LES Mark, Defendants would not be prejudiced if the Court reached this issue on the merits).  The Court's substantive assessment as to that claim is as follows.

### 2.  *Trademark protection under the Lanham Act*

An unregistered mark, such as Lopez's LES Mark, can be protected under the Lanham Act if it would qualify for registration as a trademark.  *See Courtenay Commc'ns Corp. v. Hall*, 334 F.3d 210, 214 n.2 (2d Cir. 2003).  Therefore, to establish a claim under this provision, a plaintiff must first show that he has a valid mark entitled to protection.  *See, e.g.*, *Morningside Grp. Ltd.*, 182 F.3d at 137.  To be entitled to protection, a mark must be sufficiently "distinctive" to distinguish the registrant's goods from others.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (citing 15 U.S.C. § 1052).  A mark may either be (1) "inherently distinctive," where its intrinsic nature serves to identify its particular source; or (2) distinctive by

virtue of having acquired a "secondary meaning" in the minds of consumers.  *See Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 449 (S.D.N.Y. 2008).

In addition, to be protected under the Lanham Act, a mark must also be "*used* in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark."  *Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 154 (S.D.N.Y. 2011) (emphasis added).  The mark must have been used in commerce, not merely adopted by the plaintiff.  *See id.* (citing 15 U.S.C. § 1125).

Here, Defendants dispute Lopez's contentions that: (1) his LES Mark is inherently distinctive[9] and (2) he has sufficiently used the LES Mark in commerce.

### 3.  *Inherent distinctiveness*

In assessing a claim of inherent distinctiveness, courts first determine what type of trademark is at issue—generic, descriptive, suggestive, or arbitrary and fanciful:

> A generic [mark] is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species.  A [mark] is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.  A [mark] is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.  Generic marks are never protectable; suggestive and arbitrary or fanciful marks are inherently distinctive and therefore, protectable; and if a mark is descriptive, the plaintiff must establish that it has acquired secondary meaning.

*Artisan*, 559 F. Supp. 2d at 449 (internal citations and quotation marks omitted).

Geographic terms are not inherently distinctive.  *See Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405, 409 (S.D.N.Y. 2000) ("Plaintiff's 'Greenpoint' mark is

---

[9] Because Lopez does not assert that the LES Mark had acquired secondary meaning in the one month between its introduction and the introduction by Old Navy of the Men's T-Shirt, whether that mark is protectable turns solely on whether it is inherently distinctive.  *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Mem.") 7; Tr. 38.  At argument, Lopez's counsel conceded:  "We're not asserting [the LES Mark] acquired secondary meaning by that time."  Tr. 38.

descriptive of the geographic origin of a product, here Greenpoint, Brooklyn, and will not receive trademark protection absent proof of secondary meaning.") (internal quotation omitted); *Jewelers of Am., Inc. v. Amirghanyan*, 115 F.R.D. 274, 277 (S.D.N.Y. 1987) ("[A] geographic name may be protected if secondary meaning can be established."); J. Thomas McCarthy, *McCarthy on Trademark and Unfair Competition* § 14:1, at 14-4 to 14-5 (4th ed. 2012) ("[G]eographically descriptive terms can only achieve trademark or service mark status upon acquisition of secondary meaning.").  However, a sufficiently stylized rendition of an otherwise descriptive term, including a geographic term, can make it inherently distinctive.  *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 217 (2d Cir. 2003) (noting that the personal name, Patsy's, a descriptive term, can be rendered distinctive by stylized lettering).  "The guiding principle in distinguishing protectable from unprotectable marks is that no one enterprise may be allowed to attain a monopoly on designs that its competitors must be able to use in order to effectively communicate information regarding their products to consumers."  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 382 (2d Cir. 2005).

The parties agree that the "L," the "E," and the "S" in Lopez's LES Mark refer to the Lower East Side neighborhood of Manhattan.  *See* Pl.'s Mem. 8.  Lopez maintains, however, that the interlocking character of the LES Mark and the addition of the star imbue the mark with inherent distinctiveness.  He points to the Second Circuit's decision in *Star Industries, Inc. v. Bacardi & Co.* to support the proposition that an otherwise descriptive mark (for example, one that describes a Manhattan neighborhood) can be made inherently distinct with sufficient stylization.  412 F.3d at 382.  There, the plaintiff's stylized version of the letter "O" was

inherently distinctive, because of its shading, border, and thickness.  *Id*. at 383.[10]  The Circuit

noted that "stylized shapes or letters may qualify [for protection], provided the design is not

commonplace but rather unique or unusual in the relevant market" at the "time it was

introduced."  *Id*. at 382.

Measured by these standards, it is a close call whether the LES Mark is inherently

distinctive.  On the one hand, the LES Mark—like the "O" in *Star Industries*—is a stylized

rendering of the letters "L," "E," and "S."  *Id*.  It is also the product of design efforts, not a

haphazard combination of letters.  *Cf. Prof'l Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722,

732 (S.D.N.Y. 2004), *aff'd*, 159 F. App'x 270 (2d Cir. 2005) (finding that the letter "S" was not

protectable in part because plaintiff had not "created a design for the letter").  That Lopez in

2011 had the identical LES Mark tattooed on his arm is, further, a measure, albeit a highly

nontraditional one, of the consistency of the mark's presentation.  *See* Lopez. Decl. Ex. 12; *see

also Prof'l Sound Servs.*, 349 F. Supp. 2d at 732 (lack of consistency in the way the letter "S"

appeared was a factor in determining it was not protectable).

On the other hand, the LES Mark's design—utilizing the letters of an acronym in an

interlaced pattern—is common in the apparel industry; it appears on many t-shirts, caps, and

sweatshirts.  *See* Ketty Decl. Ex. 2, at 10–12, 14–17.  Such a pattern is not "unique or unusual"

in the industry.  *See Star Indus.*, 412 F.3d at 382.  And Lopez has not presented evidence that

consumers recognize the LES Mark, or associate it with him or L.E.S. Clothing Co.  *Cf. ESPN,

Inc. v. Quiksilver, Inc.*, 586 F. Supp. 2d 219, 226 (S.D.N.Y. 2008) (allegations that consumers

recognized and associated a brand as "originating from [the defendant]" supported the

proposition that defendant's mark was distinctive).

---

[10] The "O" in *Star Industries* is analogous to the mark here, because basic shapes, like
geographic terms are not, as a matter of law, inherently distinctive.  *Star Indus.*, 412 F.3d at 382.

The relevant factors thus tug in opposite directions.  The Court's estimation is that a reasonable juror could find either way on the issue of inherent distinctiveness.  Accordingly, summary judgment cannot be granted for Defendants on the basis of this element.

### 4.  Use of the Mark in Commerce

Even if a mark is sufficiently distinctive to be protected under the Lanham Act, the mark's holder must still demonstrate its use in commerce.  *See Momentum Luggage & Leisure Bags v. Jansport, Inc.*, No. 00-cv-7909, 2001 WL 830667, at *6 (S.D.N.Y. July 23, 2001), *aff'd*, 45 F. App'x 42 (2d Cir. 2002).  "It is well established that Lanham Act jurisdiction extends to the limits of Congress's power to regulate interstate commerce.  [15 U.S.C. § 1127] defines 'commerce' to include 'all commerce which may lawfully be regulated by Congress.'" *Lebewohl v. Heart Attack Grill LLC*, No. 11-cv-3153, 2012 WL 2674256, at *5 (S.D.N.Y. July 5, 2012) (citing *Thompson Tank & Mfg. Co. v. Thompson*, 693 F.2d 991, 993 (9th Cir. 1982); *Arrow United Indus. v. Hugh Richards Inc.*, 678 F.2d 410, 413 n.5 (2d Cir. 1982)).

The Lanham Act defines "use in commerce" as the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127. Thus, the right to use a mark exclusively derives from its use in commerce, not its mere adoption.  *Gameologist*, 838 F. Supp. 2d at 154.  Use in commerce is analyzed "on a case by case basis, considering the totality of circumstances" surrounding the mark's alleged use.  *Chere Amie v. Windstar Apparel Corp.*, No. 01-cv-0040, 2002 WL 460065, at *12 (S.D.N.Y. Mar. 26, 2002). Trademark rights, moreover, do not arise from "sporadic, casual, and nominal shipments of goods bearing a mark."  *LaSociete Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1274 (2d Cir. 1974) (89 sales in 20 years totaling a gross profit of $100 was a "meager trickle of business" that did not satisfy commerce element).  When examining "use in

commerce," district courts have considered evidence of use both *before* the allegedly infringing mark enters the market, and also evidence of use afterwards.  *See Major League Baseball Properties, Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 265–66 (S.D.N.Y. 2005).

In considering the use-in-commerce element, the Court assesses Lopez's (1) advertising and promotion and (2) sales.  *See Momentum*, 2001 WL 830667, at *6 (taking similar approach when examining plaintiff's "use in commerce").

With respect to advertising, Lopez offers no evidence, outside of his own unsubstantiated testimony, of advertising related to t-shirts—or any products, for that matter—bearing the LES Mark in the month between the introduction of that mark in December 2010 and Old Navy's introduction of the Men's T-shirt in January 2011.[11]  Even after January 2011, Lopez's evidence of advertising is scant.  Lopez has adduced a photograph of himself posing with a musician, DJ Enuff, in spring 2011, in which Lopez wears a hat with an embroidered LES Mark.  Lopez Decl. Ex. 30.  He also points to a flyer from February 28, 2012, with the LES Mark depicted on three hats in the upper-right corner of the flyer, *id*. Ex. 21, and a screenshot of his current Facebook page, where the LES Mark is displayed prominently in the center of the page, *id*. ¶ 33 & Ex. 22.

Such limited advertising does not come close to supporting a finding of "use in commerce" as that term has been interpreted and applied.  For example, the district court in *Momentum* found, on summary judgment, that the plaintiff had not made deliberate and continuous use in commerce of the "Momentum" mark where the plaintiff's advertising had been limited to exhibiting the mark at a luggage trade show two years earlier, paying for one advertisement, and having several mentions in two trade journals.  2001 WL 830667, at *6.

---

[11] At argument, Lopez's counsel agreed with the Court's assessment that "when all is said and done, as to the [M]en's T-shirt in this approximate one-month period, for better or worse [the Court] is limited to the testimony of Mr. Lopez."  Tr. 40.

Although Lopez is not to be penalized for "'word of mouth' marketing," or a "lack of significant paid advertising," his actions as to advertising do not enable the Court to find sufficient commercial promotion to support a finding of "use in commerce." *See id.*

With respect to sales, Lopez's counsel confirmed that the only evidence that products bearing the LES Mark were sold in the month before Old Navy introduced the Men's T-Shirt is Lopez's testimony "that he put the mark on his products on December 15 and sold them shortly thereafter." Tr. 40. As for the period after January 2011, Lopez has proffered general evidence of sales between February 2011 and December 2011, and of sales in February 2012. Weinberger Decl. Exs. E–G. Lopez's receipts reflect sales, of all of his merchandise, totaling approximately $1,000 in 2011. *Id.* Ex. E. He also submitted handwritten notes which—if taken at face value— reflect approximately $7,000 in sales (again, of all his merchandise) during February 2012. *Id.* Ex. G. These receipts and notes, however, do not specify how much of these revenues are attributable to sales of merchandise bearing the LES Mark.

In order to arrive at a fair calculation of this figure, the Court consulted a screenshot of Lopez's website, which was produced in discovery; there, Lopez lists the products he offers; roughly half of which bear the LES Mark. *See* Lopez Decl. Ex. 10. In light of this, the Court believes it fair to attribute 50% of the sales above to merchandise bearing the LES Mark, *i.e.*, approximately $500 of apparel in 2011 and $3,500 in February 2012.

The Court also examined the evidence as to whether the commerce in which Lopez engaged with respect to this mark was interstate. Lopez did not come forward with any evidence that the materials he used to create merchandise bearing any of his marks comes from out of state. Nor did he identify any customer from out of state. However, he did present evidence that he has marketed his merchandise on his website and via a toll-free phone number. *Id.* He also

18

presented an undated PayPal receipt reflecting a shipment to Connecticut of a shirt denoted as

"LES™ 6 Black," which, it is fair to infer, refers to a shirt bearing the LES Mark.  Weinberger

Decl. Ex. F.  He also presented two other PayPal receipts reflecting out-of-state shipments: one

to Northampton, Massachusetts, and another to Covington, Georgia, both in February 2012;

neither, however, specifies the item sold.  *Id.*

  Whether this evidence satisfies the commerce element presents a close question.  On the

one hand, Lopez's evidence with respect to advertising fails entirely to support a finding of use

in interstate commerce.  And the evidence he presents as to sales, although reflecting more

robust sales activity, is sparse with respect to the critical ingredient of *interstate* commerce:

There is clear evidence of only one sale of an item bearing the LES Mark out of state.  On the

other hand, there is a fair basis to infer circumstantially a somewhat greater volume of out-of-

state business, as reflected in the fact of Lopez's use of a website, a toll-free phone number, a

Facebook page, and a PayPal account.  In addition, because Lopez's sales, until recently, were

overwhelmingly in cash, there was, as a practical matter, no documentation of sales to customers

who had come from out of state, even when this was the case.  The Court is also mindful that,

until the point of briefing on summary judgment, Lopez was proceeding *pro se* and, therefore,

was unassisted in developing a record that would have more firmly demonstrated an interstate

customer base (*e.g.*, via a subpoena to PayPal).  The evidence presented by Lopez also suggests a

recently heightened pace of business—his $3,500 in assumed sales in February 2012 with respect

to the LES Mark annualizes to more than $40,000—and it is fair to assume that some of these

sales were made to tourists or other persons from out of state.

  Because the Court finds firmly against Lopez's claims with respect to the LES Mark on

two other grounds—that he did not fairly raise a trademark claim as to the mark, *see supra* §

III.A.1, and that there is no likelihood of confusion, *see infra* § III.A.5—the Court need not

resolve this issue.  The Court assumes *arguendo* for purposes of the ensuing discussion that

Lopez has satisfied the interstate commerce element.

> ### 5.   Likelihood of Confusion

Even if the trademark claim as to the LES Mark were properly before the Court and even

if that mark was protectable, Lopez would still have to demonstrate a likelihood of confusion to

succeed on his Lanham Act claims.  By a wide margin, he has not done so.

A "likelihood of confusion" arises when "an appreciable number of ordinarily prudent

purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in

question."  *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979) (citing

*Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) (per curiam), *cert.*

*denied*, 439 U.S. 1116 (1979)).  In the Second Circuit, courts consider the oft-cited "*Polaroid*

factors" to evaluate whether there is a likelihood of confusion.  *See Polaroid Corp. v. Polarad*

*Elec. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961).  These are:

> [The] strength of [the] mark, the degree of similarity between the two marks, the
> proximity of the products, the likelihood that the prior owner will bridge the gap,
> actual confusion, . . . [the] defendant's good faith in adopting its own mark, the
> quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495.  No single factor is dispositive; each should be weighed in conjunction with others to

determine if a likelihood of confusion exists.  *Lang v. Retirement Living Publ'g Co.*, 949 F.2d

576, 580 (2d Cir. 1991).  "[N]or should a court treat the inquiry as a mechanical process by

which the party with the greatest number of factors wins.  Instead, the court should focus on the

ultimate question of whether consumers are likely to be confused."  *Playtex Prods., Inc. v.*

*Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).  The Second Circuit has held that

"summary judgment in a trademark action may be appropriate in certain circumstances, where

the undisputed evidence would lead only to one conclusion as to whether confusion is likely."
*Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996).

Here, Lopez argues that consumers who purchase (or encounter) the Men's T-Shirt "are likely to be confused as to whether Lopez sponsored, licensed, or otherwise endorsed Old Navy's T-shirts." Pl.'s Mem. 19. He argues that this confusion may occur in both a "purchase" and a "post-purchase" setting, *i.e.*, outside of Old Navy stores, because his mark is "consistently visible to the purchasing public as a constant advertisement of the product on which an evaluation of it is affixed." Pl.'s Mem. 20 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 747 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 867 (2d Cir. 1986)).

As an assessment of the relevant factors reveals, there is, clearly, no likelihood of confusion presented here.

### a.   Strength of the LES Mark

As discussed above, *see supra* § III.A.2, a mark's strength can be demonstrated either by showing inherent distinctiveness, secondary meaning, or both. *See Artisan*, 559 F. Supp. 2d at 450. "While marks with minimal stylization may be inherently distinctive, such marks are weak and entitled only to minimal protection." *Id.* at 449–50. At its core, "[t]he distinctiveness or 'strength' of a mark measures its capacity to indicate the source of the goods or services with which it is used. The greater the distinctiveness of the mark, the greater the likelihood that prospective purchasers will associate the same or a similar designation found on other goods, services, or businesses with the prior user . . . ." *Estee Lauder Inc. v. Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997) (citing Restatement (Third) of Unfair Competition § 21 (1995)).

Although the minimal stylization of the LES Mark might enable a finder of fact to find it inherently distinctive, *see supra* § III.A.3, that finding is not a foregone conclusion, and the LES

Mark is otherwise quite weak.  There is no evidence in the record supporting the thesis that consumers associate the LES Mark with Lopez or L.E.S. Clothing Co.  First, although Lopez has generally described L.E.S. Clothing Co.'s advertising efforts, he has provided no data with respect to its advertising efforts or expenditures related to the LES Mark before the Men's T-Shirt was introduced in January 2011.[12]  *Cf. Artisan*, 559 F. Supp. 2d at 450 (although plaintiff "spent $400,000 over five years in advertising its products," the court looked unfavorably upon this proffer because "there [was] no evidence as to what portion of those expenses directly relate to the . . . Mark.").  Indeed, other than the representation by Lopez's counsel "that [Lopez] put the mark on his products on December 15 and sold them shortly thereafter," Tr. 40, there is nothing even to support the claim that the LES Mark was on the market before Old Navy introduced the Men's T-Shirt.  *See 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 363 (S.D.N.Y. 2003) (affidavit from the plaintiff is "far from compelling evidence that mark has secondary meaning").  The strength of the mark, therefore, favors Defendants.

### b.  Degree of Similarity of the LES Mark and the Men's T-Shirt

"In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."  *Gruner Jahr Printing & Publ'g Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).  Even if marks appear similar in isolation, the context in which they appear may temper their apparent similarity.  *See Star Indus.*, 412 F.3d at 386.

---

[12] Although the Court has considered Lopez's February 28, 2012 flyer, Lopez Decl. Ex. 21, and a screenshot of his current Facebook page, *id.* ¶ 33 & Ex. 22, in evaluating the "use in commerce" element, such evidence is irrelevant to the determination of secondary meaning, which must be established as of the time the allegedly infringing mark (here, Old Navy's) was introduced.

There is a degree of similarity between the LES Mark and the design on Old Navy's Men's T-Shirt.  Both use the letters "L," "E," and "S" in a pattern that, at first glance, may look similar.  The patterns are not, however, identical, in that one design consists of intersecting letters and the other does not.  Moreover, any similarity between the two designs is offset by the different contexts in which they appear.  The design on the Men's T-Shirt appears in the middle of a circle, surrounded by a phrase that invites the consumer to believe that the shirt is from the fictitious "Lower East Side Sports Club."  *See Lang*, 949 F.2d at 582 (similarities did not create an issue of fact as to the likelihood of consumer confusion between "New Choices for the Best Years" and "New Choices Press" because of the different words accompanying "New Choices").  And the lettering on Old Navy's shirt is faded, much like denim, while the lettering of the LES Mark is more aptly described as cracked.  *See id.* (typeface can be taken into account when assessing similarity).  Finally, although not itself dispositive, the "Old Navy" label on the inside of the Men's T-shirt would tend to lead the average consumer to believe that the shirt is not Lopez's.[13]  *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000) ("[Defendant's] prominent use of its DENTYNE house mark significantly reduces, if not altogether eliminates, any likelihood of consumer confusion.").  This is especially so because all of Lopez's products have tags and marks indicating that they are from L.E.S. Clothing Co., "whether with a mark on the inside of a shirt, a fabric tag sewn on the side, or on a hangtag."  Lopez Decl. ¶ 17.

Lopez is correct that the Old Navy tag is not visible to persons encountering the Men's T-Shirt in a post-purchase setting—say, if a consumer were to see someone wearing the Men's T-

---

[13] Lopez correctly points out that Old Navy occasionally sells shirts bearing "well-known trademarked images and words such as Star Wars™ and Hello Kitty™."  Pl.'s Mem. 22.  Although the Court recognizes that a consumer conceivably could conclude that the shirt that he or she was purchasing at Old Navy displayed Lopez's mark (and that Lopez approved of Old Navy's use of the mark), the assembled evidence is not persuasive that the average consumer would so conclude.

Shirt while walking down Broadway.  But the other dissimilarities noted would tend to dissipate confusion in this setting: *e.g.*, the interlocking letters as opposed to overlapping letters, additional phrases, and different lettering and typeface.

Because the LES Mark and the design on the Men's T-Shirt differ both visually and in the overall impression that they convey, the degree of similarity factor favors Defendants.

### c.  The Proximity of the Products

The inquiry into the proximity of the products "concerns whether and to what extent the two products compete with each other."  *Morningside*, 182 F.3d at 140 (citation omitted). "When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source.  In contrast, the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003). Furthermore, "competitive proximity must be measured with reference to the first two *Polaroid* factors."  *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) (strong marks that are met with confusingly similar infringing marks receive protection over a "broader range of related [services]").  When examining this factor, the court may take into consideration whether the products differ in (1) content, (2) geographic distribution, (3) market position, and (4) audience appeal.  *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985).

Both Old Navy and L.E.S. Clothing Co. are in the business of selling apparel.  Both sell graphic, casual, similarly-priced t-shirts.  Moreover, Old Navy has a store in lower Manhattan.

Ketty Decl. Ex. 3.  The content and geographic distribution aspects of the "proximity" factor, therefore, favor Lopez.

On the other hand, the market position and audience appeal factors favor Defendants. Old Navy sells products nationwide, whereas Lopez has—putting aside sparse activity on his website and Facebook page—primarily confined his sales and advertising activities to lower Manhattan.  Lopez's products are not sold in the same stores or on the same websites as Old Navy's.  *Cf. Star Indus.*, 412 F.3d at 387 (selling in the "same bars and same stores" was a factor in competitive proximity).  *But see Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 619 (2d Cir. 2008) (noting that the ability to be sold in the same venue is not *necessary* for a finding of competitive proximity).  There is also an admitted difference in audience.  Like many salespersons, Lopez views "anyone" as a potential customer.  Lopez. Dep. 135–36.  However, Lopez regards Old Navy's customers as distinct from the persons he perceives as most likely interested in buying L.E.S. Clothing Co. products.  At his deposition, Lopez was asked, "And the kind of people who you emulate for your customers, they're not Old Navy customers, right?"  He responded:  "Not at all."  *Id.* at 256–57.

Because the considerations as to this factor result in a split decision—with content and geographic distribution favoring Lopez; and market position and audience favoring Defendants—the proximity of the products factor is neutral.

### d.  Likelihood of Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  *Star Indus.*, 412 F.3d at 387.  This factor "protects the plaintiff's interest in being able to enter a related field at some future time."  *Cartier*, 294 F. App'x at 619.  "Where the companies target

the same customers, there is no gap to bridge, and this factor leans in favor of the plaintiff." *Gucci Am., Inc. v. Guess?, Inc.*, No. 09-cv-4373, 2012 WL 2304247, at *20 (S.D.N.Y. June 18, 2012).

As noted, Lopez views Old Navy's consumer base as, at least significantly, distinct from his own. *See supra* § III.A.5.c.  Also relevant, Old Navy does not sell items referencing the "Lower East Side" on a consistent basis:  Products like the Men's T-Shirt—which, as of the time of this Opinion, is no longer available at Old Navy—typically have a three to four month "shelf life" before being "sold through."  *See* Tr. 13.  Finally, Lopez has not expressed a present interest in pursuing Old Navy's customers.  And, although this does not foreclose the possibility that Old Navy will enter Lopez's market, *i.e.*, conscript customers looking to buy a product that has an "authentic" Lower East Side look, Defs. 56.1 ¶ 12; Pl. 56.1 ¶ 12, the fact that Old Navy's t-shirt depicts a fictitious sports club (which in the Court's estimation tends to detract from an "authentic" Lower East Side look) makes this unlikely.  The bridging the gap factor therefore favors Defendants.

### e.  Actual Confusion

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source."  *Lois Sportswear*, 799 F.2d at 875.  However, "the existence of actual consumer confusion indicates a likelihood of consumer confusion."  *Virgin Enters.*, 335 F.3d at 151.

Lopez argues that, because "Defendants' Men's T-Shirt was sold for only a matter of months[,] . . . the absence of actual confusion is not significant."  Pl.'s Mem. 25.  He is correct that the brevity of the products' overlap would make it harder to establish actual confusion.

However, the fact remains that Lopez has not come forward with any evidence of actual

confusion (*e.g.*, a declaration or statement from a customer).  This factor, therefore, favors

Defendants.

> ### f.   Bad Faith

"The inquiry into willfulness or bad faith 'considers whether the defendant adopted its

mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any

confusion between his and the senior user's product.'"  *De Beers LV Trademark Ltd. v. DeBeers*

*Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (quoting *Savin Corp. v.*

*Savin Grp.*, 391 F.3d 439, 460 (2d Cir. 2004)) (additional citation omitted).  "The Second Circuit

'has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith,

even in the total absence of a trademark search,' although bad faith 'may be inferred from the

junior user's actual or constructive knowledge of the senior user's mark.'"  *De Beers*, 440 F.

Supp. 2d at 278 (quoting *Star Indus.*, 412 F.3d at 389).

Lopez has not presented any evidence that Old Navy adopted its mark with malice or

with the goal of capitalizing on Lopez's reputation.[14]  This factor favors Defendants.

---

[14] In opposing the motion for summary judgment, Lopez asked that discovery be reopened on the
issue whether Defendants knew of Lopez or the LES Mark when they designed and created the
Men's T-Shirt.  Pl.'s Mem. 25–27.  Under Fed. R. Civ. P 56(d)(3), "[i]f a nonmovant shows by
affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its
opposition, the court may . . . issue . . . [an] appropriate order."  In response, the Court then
issued an order in advance of argument, directing Defendants to be "prepared to discuss when
defendant the Gap first became aware of plaintiff Lopez and his company, L.E.S. Clothing Co."
(Dkt. 55).  At argument, Defendants' counsel complied with this order.  He represented that The
Gap's "first awareness of Lopez was when Lopez wrote to in-house counsel at Gap, Inc. to
advise them that the lawsuit had been filed."  Tr. 7.  He further represented that an investigation
on this point had been conducted, including a review of emails that would have captured any
reference to "Lopez" in connection with "Lower East Side" or "LES," and that responsive
documents were not found.  *Id*. at 10–11.  Rather, Defendants' counsel represented that a San
Francisco-based design team developed the two t-shirts as part of a geography-centered line of
graphic t-shirts, including such other locations such as "South Side of Chicago"; he represented

### g.   *Quality of Old Navy's Product*

The seventh *Polaroid* factor asks "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995).  There is some confusion as to how this particular factor is assessed:

> The difference in the quality of the products is one of the less probative factors in a determination of the likelihood of confusion.  Indeed, differing quality goes more to the harm that confusion can cause than it does to the likelihood of confusion.  While a marked difference in quality might harm a mark-holder more, it would also militate against finding a likelihood of confusion as customers are less likely to assume a high quality senior user would produce low-quality products.

*De Beers*, 440 F. Supp. 2d 278–79 (internal citations and quotation marks omitted).  Lopez has represented that his credibility "would be shot" in the community if he were associated with Old Navy products and that he "wouldn't be caught dead in an Old Navy T-shirt."  Lopez Dep. 256.  Such statements indicate that Lopez believes there is a notable difference between the quality of Old Navy's products and those of L.E.S. Clothing Co.  At the same time, the Court cannot ignore that the products at issues are both casual t-shirts, selling for roughly the same price.  The Court regards this factor as neutral.  It has no effect on the Court's assessment of the likelihood of confusion.

---

that the design team was unaware of Lopez.  *Id*. at 8–9.  For these reasons, and because Defendants had satisfied their discovery obligations by producing documents explaining the genesis of the color combination and font style for their t-shirts, the Court denied Lopez's request to reopen discovery.  *See Am. Express Co. v. Goetz*, 515 F.3d 156, 162 (2d Cir. 2008) (limiting further discovery and granting summary judgment in a trademark case, given that plaintiff did not identify error in the district court's determination that "such wholesale rummaging" through defendant's records was not appropriate).

### h.   Consumer Sophistication

The final factor, consumer sophistication, "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390 (citation omitted).  In general, "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trademarks will result in confusion concerning the source or sponsorship of the product." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992).

Lopez has testified that, in speaking with his customers, he has learned that they put care into their decisions about whether to purchase a t-shirt.  Lopez Dep. 258–59.  At the same time, courts have held that shopping for casual apparel does not require a heightened degree of sophistication.  *See, e.g.*, *Phillips-Van Heusen Corp. v. Calvin Clothing Co.*, 444 F. Supp. 2d 250, 257 (S.D.N.Y. 2006) ("[T]he average clothing customer is not particularly sophisticated.").  For example, in *Thoip v. Walt Disney Co.*, the district court held that although a consumer can be expected to "examine the shirt, consider alternatives, and even try it on," the purchase of a relatively inexpensive t-shirt does not call for "any degree of sophistication."  736 F. Supp. 2d 689, 714–15 (S.D.N.Y. 2010).  As a result, the court viewed this factor as neutral.  *Id.*

This Court reaches the same conclusion—although customers may choose their clothing with care, a t-shirt is still a relatively casual purchase.  As such, this factor is neutral.

### i.   Balancing the Factors

In sum, none of the *Polaroid* factors favors Lopez, five favor Defendants, and three are neutral.  In the face of the many factors favoring Defendants, even if one factor were to favor Lopez, summary judgment would still be appropriate.  *See Savin Corp.*, 391 F.3d at 462

(affirming district court's grant of summary judgment for defendant when one *Polaroid* factor favored the plaintiff).  The Court accordingly finds that there is no likelihood of confusion between Lopez's LES Mark and the Men's T-Shirt, and that a reasonable juror could not so find.

In sum, summary judgment is properly granted for Defendants because (1) Lopez did not fairly put trademark rights to the LES Mark at issue in this case; and (2) even if he did, there is no likelihood that ordinarily prudent purchasers will be misled, or confused, as to the source of Old Navy's t-shirts.

### B.  The Lower East Side Mark and LES NYC Mark

#### 1.  Protectability as a Trademark

Lopez argues that the Lower East Side Mark and LES NYC Mark are entitled to protection as marks under the Lanham Act, not because they are inherently distinctive, but because they have acquired secondary meaning.  Pl.'s Mem. 7.  A mark that is not inherently distinctive "may be distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers."  *Star Indus.*, 412 F.3d at 381.  The Second Circuit has characterized secondary meaning as follows:

> If a mark has secondary meaning, a purchaser will associate it with a certain producer, and will be likely to make that same association when an identical mark (or a confusingly similar mark), is used on another producer's product.  In the absence of secondary meaning, however, there will be no such association in the minds of the purchasing public.

*Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 215–16 (2d Cir. 1985).  The Court considers six factors in determining whether a mark has established secondary meaning: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) the length and

exclusivity of the mark's use.  *Greenpoint*, 116 F. Supp. 2d at 409.  No one factor is

determinative.  *Thompson Med. Co.*, 753 F.2d at 217.

A party seeking to establish secondary meaning must meet "'vigorous evidentiary

requirements,'" and must show that the mark acquired secondary meaning by the time the

allegedly infringing mark came onto the market.  *Id.* (quoting *Ralston Purina Co. v. Thomas J.*

*Lipton, Inc.*, 341 F. Supp. 129, 134 (S.D.N.Y. 1972)).  "Although the Second Circuit has stated

that district courts should be cautious in weighing these factors at the summary judgment stage, it

has nonetheless supported summary judgment in cases where the proponent of the alleged

trademark has failed to raise a material issue of fact on the question of secondary meaning."

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 344–45

(E.D.N.Y. 2007) (collecting cases).

The relevant inquiry, then, is whether Lopez's Lower East Side Mark or his LES NYC

Mark acquired secondary meaning by the time Old Navy placed its Men's T-Shirt on the market

in January 2011.  The Court examines the six relevant factors in turn.

### a.  Advertising Expenditures

Targeted, albeit low-cost advertising, may establish the advertising factor.  *See Mortellito*

*v. Nina of Cal., Inc.*, 335 F. Supp. 1288, 1291 (S.D.N.Y. 1972).  However, to support a finding of

secondary meaning, such advertising must have reached the targeted audience.  *Cf. Jewish*

*Sephardic Yellow Pages*, 478 F. Supp. 2d at 345.

Given the modest scale of Lopez's business, it is of course not expected that he would

come forward with evidence of high-cost advertising.  Lopez, however, has not presented proof

of *any* advertising expenditures before January 2011.  He has marketed his t-shirts in other ways:

Crediting his Rule 56.1 Counterstatement, he has distributed flyers featuring the Lower East Side

31

and LES NYC Marks since 1999, *see supra* note 5; and worn his products to various events and maintained an online presence since 2006.[15]  He has also produced two magazine advertisements for his t-shirts, which ran in 2008 and 2010.  Lopez Decl. Exs. 19, 20.[16]  He has provided an undated photograph of a wall mural displaying the Lower East Side Mark.  *Id.* Ex. 14.

Even if Lopez had produced evidence of advertising expenditures in connection with his marketing activities, or if the ordinary requirement of actual expenditures was relaxed in light of the small scale of his business, this factor would still not support a finding of secondary meaning. That is because Lopez has not come forward with *any* evidence that his marketing activities succeeded in reaching a relevant segment of the population such that consumers associate Lower East Side or LES NYC with his company.  *Jewish Sephardic Yellow Pages* is instructive on this point.  There, the district court found that the thousands of dollars that the plaintiff spent on advertising was unpersuasive evidence of secondary meaning because the plaintiff had not demonstrated that its efforts "succeeded in reaching the Jewish phonebook users who [were] plaintiff's target audience."  478 F. Supp. 2d at 345.  The plaintiff also failed to show "with any level of specificity the portion" of the advertising related to the trademark at issue.  *Id.*  The same is true here.

Because there is no evidence either of advertising expenditures or that Lopez's marketing efforts have caused the consuming public to associate the Lower East Side Mark or the LES

---

[15] Lopez did not purchase his domain name until 2010.  Lopez. Decl. ¶ 21.  His online presence before this time was maintained through his MySpace page.  *Id.* ¶ 19.  Lopez has also submitted a receipt, reflecting that he paid $900 to Discoboy Entertainment for the design of his website. His initial down payment, however, was made on March 15, 2011, *i.e.*, outside the timeframe relevant for determining secondary meaning.  *See id.* Ex. 10.

[16] Lopez testified that he paid for these ads—or at least the majority of the cost of them—by means of barter (implicitly, in the form of t-shirts or other merchandise).  *See* Lopez Dep. 122.

NYC Mark with him or his business, no reasonable juror could find that these activities support a finding of secondary meaning as of January 2011.

### b.   Consumer Studies Linking the Marks to Lopez

Lopez has not submitted studies showing that consumers associated either the Lower East Side Mark or the LES NYC Mark with a single source, *i.e.*, him or L.E.S. Clothing Co.  To be sure, consumer surveys are not necessary for a finding of secondary meaning, *see GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 294 (S.D.N.Y. 2002), and the Court is mindful that Lopez's is a small business without access to the resources with which to mount a substantial study.  However, the case law does reflect that "[c]onsumer surveys are 'the most direct and persuasive evidence of secondary meaning.'"  *Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 227 (S.D.N.Y. 1996) (quoting *Co–Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1333 n.9 (8th Cir. 1985)).

Lopez asks that this factor be considered neutral, because "Defendants have not offered any consumer survey evidence of their own to show that consumers *do not* associate Lopez's Marks with a single source."  Pl.'s Mem. 16 (emphasis added).  The burden of proof, however, is on Lopez, as the plaintiff, and, in analyzing this factor, courts have not required defendants to conduct consumer surveys where the plaintiff has not conducted one of his own.  Although the Court appreciates the modest nature of Lopez's business and that it is unrealistic to expect him to mount more than a very modest survey, and therefore assigns little weight to this factor, this factor, ultimately, cannot support a finding of secondary meaning for either the Lower East Side Mark or the LES NYC Mark.

*c.   Unsolicited Media Coverage*

Lopez offers modest evidence, through testimony and documents, of "unsolicited media coverage."  *See* Pl.'s Mem. 16.  Specifically, he offers (1) testimony that an artist was featured in the magazine *Hip Hop Weekly* wearing his apparel, Lopez Decl. ¶ 36; (2) screenshots of his apparel in a music video that was distributed through Yahoo! Music, *id.* Ex. 27; and (3) pictures of music artists wearing his apparel, *id*. Exs. 23–26, including a screenshot of an artist wearing a t-shirt with the Lower East Side Mark in the online publication, *Hip Hop Games*, *id*. Ex. 28. This evidence does demonstrate that local figures have worn clothing with the Lower East Side Mark and the LES NYC Mark.  It is not, however, clear that the media coverage, such as it is, on each of these occasions was unsolicited.  Lopez's evidence as to these three incidents is insufficient to show enough unsolicited media coverage to support a finding of secondary meaning.  *See Gameologist*, 838 F. Supp. 2d at 159 (plaintiff's testimony that magazine articles were published about the plaintiff, when it was unclear whether these articles were unsolicited or instead solicited as part of a promotional strategy, do not support finding of unsolicited media coverage).

In any event, even assuming that the media coverage to which he has pointed was all unsolicited, Lopez does not produce any evidence that consumers connected the apparel depicted in the photographs or the video to him or his company.  In other words, the photographs and the video may establish that Lopez had satisfied customers, but it does not establish that his marks had taken root.  On this point, the district court's decision in *Morgans Group LLC v. John Doe Co.* is instructive.  There, the plaintiff attempted to show secondary meaning for the name of its rooftop bar, "Sky Terrace," by producing evidence of unsolicited media coverage—being featured in "a number of guides to New York City's bars," getting "brief mentions in the *New*

34

*York Post* and *Vogue*," and being "used as a on-site location for the filming of television shows and the shooting of photographs for magazine articles"; the court, however, held that this coverage did not support a finding of secondary meaning for "Sky Terrace."  No. 10-cv-5225, 2012 WL 1098276, at *7 (S.D.N.Y. Mar. 31, 2012).  It reasoned that the plaintiff had "not offered any evidence to demonstrate that these listings have created the required association in the minds of the consumers who are likely to patronize Sky Terrace."  *Id*.  The same analysis applies here.

### d.  Sales Success

Lopez's evidence also falls short with respect to sales success.  He estimates that he sold several thousands of dollars of apparel per year between 2007 and 2011, never exceeding $10,000 in any one year.  *See* Pl.'s Mem. 14; Lopez Dep. 75–76.  But Lopez has supplied very limited documentation of those claims.[17]  The only quantifiable evidence of his sales are (1) two PayPal receipts totaling $94.80 (one for $40.00 in 2007 and the other for $54.80 in 2008), Weinberger Decl. Ex. E, and (2) Lopez's tax return for 2010, on which he reported gross sales of $2,000 in that year, *id*. Ex. H.

To be sure, Lopez's is a small business and it sells goods in a confined geographic area; to establish secondary meaning, therefore, his documented sales need not be as large as if he were seeking to establish secondary meaning in a large market.  However, even if one credits Lopez's unsubstantiated representation that he made up to $10,000 each year through L.E.S. Clothing Co., and disregards his representation on his 2010 tax return that his 2010 sales were

---

[17] Lopez started maintaining regular business records in February 2012, after this litigation started.  He notes that he has written documentation of $7,000 in sales in February 2012. Weinberger Decl. Ex. G.  But because the pertinent issue is whether the Lower East Side Mark and LES NYC Mark had gained secondary meaning by January 2011, sales from February 2012 are of limited relevance.

considerably smaller ($2,000), such sales still do not suffice to support a finding of secondary

meaning.  *See, e.g.*, *Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1339 (2d Cir. 1992)

(summary judgment proper for failure to establish secondary meaning where 20,000 offers for

free samples were mailed and 8,000 responses received); *Black & Decker Corp.*, 944 F. Supp. at

227 ($16,000 per year in sales characterized as "minimal commercial activity" insufficient to

establish secondary meaning); *Sunrise Home Juices, Inc. v. Coca–Cola Co.*, 220 F. Supp. 558,

559–61 (S.D.N.Y. 1963) (sales growing from $30,000 in 1952 to $600,000 in 1963 were

insufficient to show secondary meaning).  Lopez's reliance on *Mortellito v. Nina of California* is

unpersuasive.  335 F. Supp. at 1290.  The plaintiff there ran a small business and had sales of

$184,000 over one year.  The sales here are lower by many orders of magnitude.  They do not

support a finding of secondary meaning.

### e.  Attempts to Plagiarize the Marks

Evidence that a mark has been widely copied is persuasive evidence of secondary

meaning because it demonstrates that the mark has become a "strong source identifier in the eyes

of the purchasing public."  *See T. Anthony, Ltd. v. Malletier*, No. 93-cv-6900, 1993 WL 659682,

at *3 (S.D.N.Y. Nov. 24, 1993).

Lopez has brought five similar lawsuits prior to the instant action.  In each, he claimed

rights in the Lower East Side Mark and/or the LES NYC Mark.  Tr. 143.  In none of these prior

suits has a court adjudicated, on the merits, claims regarding Lopez's rights in the marks.  Defs.

56.1 ¶ 53; Pl. 56.1 ¶ 53.  The Court, accordingly, finds that Lopez has sufficiently documented

both his attempts to police the use of "Lower East Side" and "LES NYC," and the fact that third

parties have used these terms on their products.  However, although there is evidence of third

parties *using* these terms, there is no evidence of third-parties *copying* Lopez.  That distinction is

pivotal where, as here, the terms are geographic ones which other merchants quite plausibly could have chosen with no awareness of (let alone intent to copy) Lopez's marks.

Lopez argues that this factor nevertheless favors a finding of secondary meaning because Defendants have not provided a "credible explanation" for the "similarity of [the third parties'] products to Lopez's." Pl.'s Mem. 15–16. For this argument, he relies on the Second Circuit's decision in *Centaur Communications v. A/S/M Communications, Inc.*, 830 F.2d 1217 (2d Cir. 1987), in which the plaintiff was using the title "Marketing Week," and the defendant began using the title "Adweek's Marketing Week." *Id.* at 1224. The court there noted the defendant's failure to "provide a credible explanation" for the title change, given that the parties had previously discussed a joint venture and the defendant's "executive vice-president and principal stockholder had copies of *Marketing Week* in his office." *Id.*

This case is quite unlike *Centaur*. There is no evidence that Defendants were copying Lopez's marks, nor any evidence of a preexisting relationship between Defendants and Lopez; quite the contrary, Defendants' attorney has represented on behalf of his clients, following a detailed review of company records including emails, that his clients had never heard of Lopez or L.E.S. Clothing Co. before he filed this lawsuit. Tr. 7; *see supra* note 14. And there is an obvious, benign explanation for others' use of the "Lower East Side" term—it is geographic. This factor thus does not favor a finding of secondary meaning.

### f.    Length and Exclusivity of Use

With respect to the length of time that Lopez has used the Lower East Side and LES NYC Marks, he began using both marks in 1997, Lopez Dep. 37, as reflected in an online interview in which he recounted the history of his company and his use of these two marks. *See* Weinberger Decl. Ex. D.  Lopez's use of these marks for 15 years favors a finding of secondary

meaning.  *See Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 541–44 (2d Cir. 1956) (secondary meaning found based on 11 months of use).

With respect to exclusivity, however, numerous companies use the term "Lower East Side" in their business name and on apparel.  *See* Weinberger Decl. Ex. U.[18]  As noted, there is no evidence that any of these businesses—both those Lopez has sued, and those he has not—have employed the terms in an effort to capitalize on Lopez's marks or the reputation of his business. Rather, companies use these terms because they are geographically relevant, particularly for businesses with a presence on the Lower East Side of Manhattan.  That these terms permeate the market undermines Lopez's claim that his use of these terms has acquired secondary meaning.  In *Greenpoint*, for example, the court found that the term "Greenpoint" lacked secondary meaning because "[a] quick glance through the Brooklyn phone directory establishes that more than fifty other establishments conduct business under the 'Greenpoint' name.  Such significant third party usage . . . undermines Plaintiff's claim of secondary meaning."  116 F. Supp. 2d at 410.

The Court therefore concludes that, considered together, the six relevant factors favor, decisively, a finding of no secondary meaning.  On the evidence at hand, no reasonable jury could find that, as of January 2011, consumers had come to identify the Lower East Side Mark or LES NYC Mark with Lopez or his company.

### 2.   *Use of the Marks in Commerce*

Because Lopez's marks have not attained secondary meaning, it is not necessary that the Court determine whether Lopez has made sufficient use in commerce of these two marks.  *See Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1343 (2d Cir. 1992) (affirming summary judgment on the basis that plaintiff failed to establish secondary meaning).

---

[18] Indeed, Defendants have demonstrated that another company uses "Lower East Side" and "LES" on t-shirts, just as Lopez does.  Weinberger Decl. Ex. U.

### 3.  Likelihood of Confusion

Although to resolve Lopez's Lanham Act claims the Court need not determine whether there is a likelihood of confusion between the Lower East Side Mark or the LES NYC Mark and either of Old Navy's t-shirts,[19] the Court addresses this point briefly because of its relevance to Lopez's state law claims.  Specifically, the Court finds that there is no likelihood of confusion with regard to either mark.  The Court examines each mark in turn.

With respect to the LES NYC Mark, neither shirt even employs the letters "LES NYC": The Women's T-Shirt has the letters "N," "Y," and "C" near the bottom of the pastel flower (but lacks stars and, importantly, the individual letters "L," "E," or "S").  The Men's T-Shirt uses neither "LES" nor "NYC."[20]

With respect to the Lower East Side Mark, although both shirts use the phrase "Lower East Side," neither employs it in the way Lopez has used it on his apparel (*i.e.*, with "Lower" on the first line, "East" on the second, and "Side" on the third, bracketed by a line above "Lower" and a line below "Side").  Further, the *Polaroid* factors of (1) likelihood of bridging the gap; (2) actual confusion; and (3) bad faith favor the Defendants here for the same reasons as with respect to the LES Mark.  Finally, because the mark (like most geographic marks) is not inherently

---

[19] "Where a mark is ineligible for protection, there is no need to examine likelihood of confusion. Such an inquiry would, of course, be redundant, since a determination that a mark is ineligible for protection establishes that consumers do not associate that mark with a particular source." *Thompson Med. Co.*, 753 F.2d at 216; *see also Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 579 n.1 (2d Cir. 2005) (noting that courts need not "'slavishly recite the litany of all eight *Polaroid* factors'" (quoting *Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 654 (2d Cir. 1988))).

[20] As previously noted, the USPTO refused Lopez's federal trademark application for the LES NYC Mark on September 19, 2011, noting that the "proposed mark is primarily geographically descriptive of the origin of the applicant's goods."  Weinberger Decl. Ex. I.  At the time of this Opinion, Lopez's application is suspended.  *Id.* Ex. J; *see* USPTO website, http://tarr.uspto.gov, serial no: 85335314 (last visited July 26, 2012).

distinctive and has not gained secondary meaning, measured against the *Polaroid* strength of the mark factor, it is a weak mark.

For these reasons, no reasonable juror could find a likelihood of confusion between the Lower East Side Mark or the LES NYC Mark and either of Old Navy's t-shirts.[21]

### C.  State Law Claims

In light of the above rulings, Lopez's state law claims of common law trademark infringement and unfair competition must be dismissed as a matter of law, as to all three marks. Under New York law, "the elements necessary to prevail on causes of action for trademark infringement and unfair competition . . . mirror the Lanham Act claims." *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (internal quotation marks omitted).  In particular, to prove common law trademark infringement, a plaintiff must show a "likelihood of confusion as to the source or sponsorship of defendant's products." *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982).  Although Lopez has New York State trademark registrations for his Lower East Side Mark, his LES NYC Mark, and his LES Mark, Lopez Decl. Exs. 2, 4–5, he has failed to show a likelihood of confusion between these marks and either Old Navy t-shirt at issue.

Similarly, to prevail on a claim of unfair competition under New York law, a plaintiff must show (1) likelihood of confusion and (2) bad faith on the part of the defendants.  *See Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 408 (2d Cir. 1997) ("[T]he essence of unfair competition is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.").  In other

---

[21] Because the Court has resolved the claims in this case on other grounds, there is no occasion to reach Defendants' argument that their use of the terms "Lower East Side" and "LES" constitutes fair use of these geographic terms.

words, a plaintiff "must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating [the defendant's] bad faith.'"  *Info. Superhighway, Inc. v. Talk Am., Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) (quoting *Philip Morris USA Inc. v. Felizardo*, No. 03-cv-5891, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004)).  As discussed, however, Lopez has failed to show either confusion or bad faith.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED

with respect to all of Lopez's claims.  The Clerk of the Court is directed to terminate the motion

at docket number 35, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 2, 2012
       New York, New York